# United States Court of Appeals
## For the First Circuit

No. 10-1984

UNITED STATES,

Appellee,

v.

CARLOS RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, <u>U.S. District Judge</u>]

Before

Lynch, <u>Chief Judge</u>,
Howard and Thompson, <u>Circuit Judges</u>.

<u>Bernard Grossberg</u> for appellant.
<u>Cynthia A. Young</u>, Assistant U.S. Attorney, with whom <u>Carmen M. Ortiz</u>, United States Attorney, was on brief, for appellee.

March 28, 2012

**THOMPSON, Circuit Judge**. Before the ink could dry on its verdict convicting Carlos Rodriguez of being a felon in possession of a firearm, the trial judge learned that a pocket-sized New Testament Bible was found in the jury deliberation room. The judge promptly notified Rodriguez's counsel of the discovery and he immediately filed a motion for a new trial. In his motion, counsel argued that the Bible's presence in the jury room violated Rodriguez's Sixth Amendment right to a trial before an impartial jury and his Sixth Amendment right to confront the witnesses against him. To determine what role the Bible may have played in the jury's deliberations, Rodriguez asked the trial judge to recall each juror for purposes of conducting an individual voir dire. The motion was denied. Thereafter, Rodriguez filed a second motion for a new trial, which, unlike the first, was related to the actual trial proceedings. This time around, Rodriguez claimed that the prosecutor made improper comments during closing and rebuttal arguments that violated Rodriguez's Fifth Amendment rights. Again, the motion was denied.

Before this court, Rodriguez contends the district court erred in denying both motions. Additionally, he claims that certain alleged errors by his defense counsel denied him his constitutional rights to due process and effective assistance of counsel. After careful review of the record, we discern no error and therefore affirm.

I.      BACKGROUND

A.  Facts

  1.  The Police Discovery of the AK-47

Late in the evening on September 24, 2006, a parked, unattended, green Toyota Camry caught the attention of Methuen police officer Justin Law ("Law"). He recorded the license plate number of the car and made several observations. First, he detected no signs of ignition damage, indicating to him that the car had not been stolen. Second, the hood of the car was warm, causing Law to believe that the car had been recently driven. The car was also unlocked. Law peered inside and saw in plain view the buttstock of an AK-47. He recognized the firearm "immediately."

Law called for backup and he and his fellow officers removed the AK-47 from the car and looked it over -- it was loaded with one round of ammunition in the chamber and 24 additional rounds in the magazine. With the assistance of other responding officers, Law searched the entire inside of the car, as well as the trunk. Inside the car, officers discovered marijuana, a scale, a GPS, binoculars, and a driver's license issued to William "Billy" Ryan.[1] Body armor was found in the trunk. Sometime later, Law ran the license plate number of the car and identified Melodee Sweeney ("Sweeney") as the owner.

---

[1]For purposes of this opinion, it will suffice to know that "Billy" Ryan was a friend of Rodriguez's who lived at Rodriguez's mother's house in Lawrence, Massachusetts.

2. The Police Encounter with Rodriguez

Methuen Police Officers Jeffrey Brouck ("Brouck") and James Gunter ("Gunter") were among those officers who responded to Law's call for backup. Brouck said he was on patrol in the parking lot at Morse Park, a park containing a few baseball fields and a skateboard park, for "under ten minutes" before he was ordered by a sergeant "to go out and look for any individuals in [the] immediate area." As he left the park, Brouck "saw a Hispanic male walking towards [him] wearing a red shirt, a black hat, and light blue pants." This individual was later identified as Rodriguez. Brouck stopped his cruiser.

Gunter, who was directly behind Brouck in a separate police car, stopped as well and together the officers approached Rodriguez. Gunter asked him if he had any identification, to which Rodriguez replied that he did not. Nonetheless, he offered a name -- "Edward Santiago" -- and a home address -- 48 Warren Street, Lawrence, Massachusetts. He also provided a date of birth and Social Security number. Brouck radioed this information to Methuen dispatch who confirmed that "Santiago" had a valid driver's license and no outstanding warrants. When asked where he had been immediately before his contact with the officers, Rodriguez said he had been at a nearby Dunkin' Donuts. After answering all of the officers' questions, Rodriguez asked them to call him a taxi, which they did. After sending Rodriguez on his way the officers split

up. Brouck went to the Dunkin' Donuts Rodriguez said he had visited and Gunter headed to 48 Water Street, the home address Rodriguez had given. Come to find out, 48 Water Street did not exist.

3. Rodriguez's phone conversation at Dunkin' Donuts

Brouck found out Rodriguez had in fact visited the nearby Dunkin' Donuts earlier that evening. At trial, a former Dunkin' Donuts employee, Joseph John Garofalo ("Garofalo"), testified that on the night of September 24, 2006, a "[v]ery aggressive and mad" customer had caught his attention. Garofalo described the customer as a "Spanish male about five-seven," who was wearing a "red hat [and] baggy clothes." He said the customer was "walking around, talking," and "[j]ust [seemed] very agitated." While inside the Dunkin' Donuts, the man -- whom Garofalo later identified as Rodriguez -- made approximately three different phone calls from his cell phone. Garofalo overheard one end of one of the conversations. He heard Rodriguez say, "[t]ell the girl the car had been stolen." He also heard Rodriguez say: "Go get the AK-47 out of the car. And there's something else in the car. Go get it. It's in the trunk. You know what it is." Not long thereafter, Rodriguez headed out of the Dunkin' Donuts, stopped to ask Garofalo for a cigarette, and walked away.

4.  Sweeney's statement to police -- Take One -- and Rodriguez
    and Sweeney's flight to New York

Around midnight on September 24, 2006, Lawrence police contacted Sweeney and told her she needed to come to the station to get her car. She did not go until approximately 5 p.m. on September 25, 2006. At the station Lawrence and Methuen police officers interviewed Sweeney four separate times, over the course of four hours. During these interviews, Sweeney told police that someone had stolen her car after she left the keys in it while running a quick errand. This was a lie. When asked if she had seen Rodriguez the day before, on September 24, 2006, she told the officers no. This too was a lie.[2]

The police, suspicious of Sweeney's story, told her that they did not believe her. Moreover, they let her know that they were looking for Rodriguez, had found an AK-47 and body armor in her car, and were planning to subpoena her phone records. After the interviews were over, Sweeney did not stick around. She headed to her home in Pelham, New Hampshire. According to Sweeney, Rodriguez "showed up at [her] house late that night" and Sweeney filled him in on the specifics of what happened at the police

_____

[2]Sweeney would later change her story to admit that Rodriguez, Sweeney's then boyfriend whom she had known for approximately fifteen years, had her car with her permission and had taken it "to go handle something," and that Sweeney had been with Rodriguez most of the day on September 24, 2006, ending up at Rodriguez's sister's house. They stayed there together until Rodriguez left with Sweeney's car later that evening.

station.  At trial, Sweeney said that Rodriguez acted "nervous" upon learning that the police were looking for him and he decided "[they] needed to get out of [Massachusetts]" for awhile. According to Sweeney, Rodriguez felt the couple should flee to Rochester, New York.  So they did.  They hung out there for approximately three weeks at Rodriguez's uncle's house.

5.  Sweeney's statement to police -- Take Two -- upon her return to  Massachusetts

Eventually, Sweeney decided to return to Massachusetts because of her children.[3]  Knowing full well the police would likely have more questions for her, she and Rodriguez concocted a story, first to dissuade the police from looking for Rodriguez in New York, and second, to clear Sweeney's name.  The duo agreed that Sweeney would tell the police that she and Rodriguez had taken her car to Worcester, Massachusetts together and that it had taken her three weeks to come back because she "was scared for [her] life."[4] Sticking to their plan, Sweeney went to the Methuen Police Station on October 30, 2006 and repeated the false story to the police.  To this fabrication, she added yet another -- that she and Rodriguez "fought," that "[she had been] abused by him," and that he had

---

[3]By this time, Sweeney had learned that there was a warrant out for her arrest based on her filing a false stolen vehicle report.  She also learned that the police had questioned her brother, a Massachusetts state trooper, and gone to the home of her father, a Massachusetts correctional officer.

[4]We are unable to discern from the record what or whom Sweeney was supposed to be scared of.

taken her to Worcester against her will. Additionally, she told the police that on September 24, 2006, Rodriguez had taken her car without her permission and then told her to report it stolen.

6. Sweeney's testimony before the Grand Jury -- Take Three -- and Sweeney's statement during the summer before trial -- Take Four

Rodriguez stayed in New York until he was found and arrested there around December of 2007[5] -- approximately 15 months after the discovery of the AK-47 in the abandoned car.

In July of 2008, Sweeney appeared before a federal grand jury as a witness for the government in regard to the present case. There, she denied having seen or known anything about the AK-47, admitted that her October 30, 2006 story to police about going to Worcester had been a lie, and stated that Rodriguez had gone to New York, but that she had stayed in touch with him by phone.

Changing stories one more time during the summer of 2009, Sweeney told the prosecutor assigned to the case and a Bureau of Alcohol, Tobacco, Firearms, and Explosives agent that she was actually with Rodriguez in New York -- not that she had simply kept in touch with him by phone.

7. Sweeney's testimony on the eve of trial -- Take Five

On Sunday, September 20, 2009, the night before Rodriguez's trial, Sweeney signed a letter of immunity insulating

---

[5]The record is devoid of any details surrounding Rodriguez's apprehension.

her from prosecution based on the prior, false statements she made to police officers throughout their investigation, as well as the false statements she made before the grand jury. She was also granted immunity for any of the underlying criminal acts she had admitted to. After securing this immunity agreement Sweeney told the government for the first time that she had seen Rodriguez with the AK-47 found in her car the day before she reported the car stolen. Similarly, Sweeney mentioned, again for the first time, that Rodriguez had planned to, and actually did, rob his mother's Cuban neighbors of cocaine, wearing a bulletproof vest and carrying an AK-47. That night, the government sent Rodriguez's counsel a letter informing them of Sweeney's latest version of events.

8. Rodriguez's response to Sweeney's latest version of events

On the first morning of trial, Rodriguez's counsel argued that Rodriguez was prejudiced by Sweeney's latest version of events, which had been brought to counsel's attention for the first time on the eve of trial. Moreover, counsel argued that given the numerous versions offered by Sweeney, her testimony was so lacking in credibility that it should be stricken completely.

Though the government did not concede that Rodriguez had in fact been prejudiced by Sweeney's late disclosure, it nonetheless asserted that it was willing to take a "middle-of-the-road" approach and refrain from mentioning the alleged robbery as long as it could present evidence to the jury that Sweeney: (1) saw

Rodriguez in possession of the gun the day before it was recovered by the police and (2) knew when Rodriguez took her car on September 24, 2006, that he was "going to do a deal." According to the government, this would allow into evidence testimony that it felt was crucial to making its case while at the same time alleviating any prejudice, assuming there was prejudice, to Rodriguez. However, the defense argued that the two recent allegations which the government sought to introduce at trial were "inextricably linked" to Sweeney's other numerous versions of events and, therefore, any effort by the district court to "prune out" some of Sweeney's testimony, but not all, would not effectively "extract the prejudice from the situation."[6]

The district court denied the defense's motion to strike Sweeney's testimony in the entirety. Instead, it limited the scope of Sweeney's testimony regarding her latest version of events to two days -- the day before the gun was recovered, September 23, 2006, and the day the gun was recovered, September 24, 2006. Although the alleged robbery took place on September 23, 2006, the district court nonetheless prohibited the prosecution from mentioning it. Defense counsel expressed concern that this

---

[6]Additionally, defense counsel argued that such testimony should be excluded under Fed. R. Evid. 404(b). The district court stated on a few different occasions that it was not sure if the evidence defense counsel sought to exclude constituted 404(b) evidence. While resolution of the issue is not essential for purposes of this appeal, we nonetheless note that counsel's 404(b) argument was weak.

"sanitized version" of events surrounding Sweeney's last minute disclosures would prevent them from cross-examining Sweeney regarding the "outrageousness" of her robbery story. Acknowledging defense counsel's "dilemma," the district court stated that it would give counsel "huge latitude in trying to figure out what to do with that." Ultimately, defense counsel introduced the alleged robbery during cross-examination of Sweeney in an attempt to illustrate her history of lying and lack of credibility.

B. Procedural History

On October 2, 2009, a jury found Rodriguez guilty of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Shortly thereafter, the trial judge informed Rodriguez's counsel, by letter, that her law clerks had seen a "pocket-sized New Testament on top of a juror notebook on the table in the jury room." In the letter, the trial judge explained that she was "bring[ing] this matter to [counsel's] attention for whatever steps, if any, [defense counsel] think[s] are appropriate."

On October 7, 2009, Rodriguez filed a motion for a new trial, claiming that the presence of the Bible in the jury room had tainted the jury thereby violating two separate Sixth Amendment constitutional rights -- his right to confrontation and his right to a trial before an impartial jury. After holding a hearing on the motion, approximately three weeks after the jury had been discharged, at which the jury foreperson testified that the Bible

-11-

was not discussed during jury deliberations, the court was satisfied that the jury had not been improperly influenced by the Bible's presence and therefore denied the motion. It also denied Rodriguez's alternative request that the court recall each juror for an individual voir dire.[7] Rodriguez filed a second motion for a new trial on October 13, 2009 -- this time arguing that the government violated his constitutional right against self-incrimination when it stated in its closing that Rodriguez "acted like a guilty man" and further arguing that the government improperly vouched for its witnesses in rebuttal. Again, the district court denied the motion. On September 29, 2010, Rodriguez was sentenced to fifteen years' imprisonment and five years of supervised release. This appeal followed.

II. Discussion

A. Ineffective Assistance of Counsel[8]

Before getting into the merits of Rodriguez's claim, we must first address a preliminary matter dealing with the procedural posture of this case.

---

[7]The district court failed to mention Rodriguez's Sixth Amendment Confrontation Clause argument in its Order and Memorandum, though Rodriguez did present the argument in his motion for a new trial, in fact, the same exact argument, word for word, that he presents on appeal.

[8]In his brief, Rodriguez also states, without explanation, that his right to due process was violated. Thus, this issue is deemed waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (holding that issues raised in a perfunctory manner with no attempt at developed argumentation are deemed waived).

Rodriguez failed to present his ineffective assistance of counsel claim to the district court and is instead raising it now, for the first time on this direct appeal. "We have held with a regularity bordering on the monotonous" that ineffective assistance of counsel claims, which require a showing of deficient attorney performance and prejudice to the defendant, "must originally be presented to, and acted upon by, the trial court."[9] United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993). "This is because an appellate court usually is ill-equipped to handle the fact-specific inquiry that such claims often require." United States v. Ofray-Campos, 534 F.3d 1, 34 (1st Cir. 2008). "In addition, the insights of the trier, who has seen and heard the witnesses at first hand and watched the dynamics of the trial unfold, are often of great assistance." United States v. Moran, 393 F.3d 1, 10 (1st Cir. 2004). It is only in exceptional cases when there are no "critical" facts in dispute and the record has been sufficiently developed that we will address an ineffective assistance of counsel claim on direct appeal. Ofray-Campos, 534 F.3d at 34; United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006).

Though Rodriguez failed to present his ineffective assistance of counsel claim to the district court both parties

[9]Our general practice is to deny an appellant's ineffective assistance of counsel claim without prejudice to his right to renew it, if he chooses, by means of a petition under 28 U.S.C. § 2255. See United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005).

-13-

agree that this is one of those "case[s] that presents an exception to the well-settled rule," and warrants our review of the claim. Ofray-Campos, 534 F.3d at 34. While we are not bound by the parties' agreement and reaffirm our position that such claims are better suited for the district court in the first instance, we nonetheless agree with the parties that the record is sufficiently developed and the claimed errors sufficiently clear to address Rodriguez's deficient counsel contentions. See United States v. Gonzalez-Arimont, 268 F.3d 8, 13 (1st Cir. 2001) (finding that defendant's ineffective assistance of counsel claim fell "squarely within" the exception to the preference for resolving such claims by means of collateral attack); cf. Ofray-Campos, 534 F.3d at 34 ("We cannot tell from the record whether [counsel's] decision . . . was a legitimate tactical decision at the time that it was made or deficient performance in violation of [the defendant's] right to effective assistance of counsel."). With that settled, we now move to the merits.

Rodriguez alleges that his trial counsel was ineffective for two reasons: (1) counsel elicited testimony from Sweeney, which the trial court had precluded the government from doing, specifically, the information regarding the alleged Cuban robbery and (2) counsel failed to object to the prosecutor's questions to Sweeney regarding her immunity agreement with the government.

For Rodriguez to succeed on his ineffective assistance of counsel claim he "must show both deficient performance by counsel

-14-

and resulting prejudice." Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

"In order to satisfy the 'deficient performance' prong, [Rodriguez] must show that his trial counsel's representation 'fell below an objective standard of reasonableness.'" Id. (quoting Strickland, 466 U.S. at 688). "Judicial scrutiny of counsel's performance must be highly deferential" to avoid "the distorting effects of hindsight" and allow us "to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Moreover, we must assess counsel's reasonableness in light of "prevailing professional norms." Id. at 688-89. That said, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Therefore, Rodriguez "must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "[T]his court has held that a lawyer's performance is deficient under Strickland 'only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it.'" Tevlin, 621 F.3d at 66 (quoting Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)).

To demonstrate "prejudice," Rodriguez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

<u>Porter</u> v. <u>McCollum</u>, 130 S. Ct. 447, 453 (2009) (internal quotation marks and citation omitted); <u>see also</u> <u>Moreno-Espada</u> v. <u>United States</u>, 666 F.3d 60, 64 (1st Cir. 2012). This does not require Rodriguez to show "that counsel's deficient conduct more likely than not altered the outcome" of his trial, but it does require "a probability sufficient to undermine confidence in [that] outcome." <u>Porter</u>, 130 S. Ct. at 455-56 (internal quotation marks and citation omitted).

Rodriguez first argues that he received ineffective assistance of counsel because trial counsel elicited testimony from Sweeney regarding Rodriguez's participation in the robbery of his mother's neighbors, which the trial judge had prohibited the government from introducing. Rodriguez contends that his trial counsel made an unreasonable strategic decision when, despite the district court's ruling, counsel nonetheless introduced the excluded evidence during cross-examination of Sweeney.

After careful consideration of the record, it is clear that trial counsel mentioned Rodriguez's alleged participation in the robbery of his mother's neighbors as a matter of trial strategy. Counsel sought to portray Sweeney's robbery story as outrageous -- indeed, a made up fabrication -- and if the jury found this portion of her testimony unbelievable, then doubt would be cast on all of her testimony. Discrediting Sweeney's testimony was crucial to the defendant's case, particularly because Sweeney was the only witness who placed Rodriguez in the car with the AK-47

and the bulletproof vest.  With the veracity of Sweeney's testimony already at issue due to her various false statements and multiple versions of events to the police and government, all of which were hammered on cross-examination, if the trial strategy had been accepted, defense counsel could have convinced the jury that Rodriguez never had the AK-47 in his possession.  While defense counsel's strategy ultimately proved unconvincing to the jury, it was not "so patently unreasonable that no competent attorney would have made it."  Knight, 447 F.3d at 15 (internal quotation marks omitted).

Rodriguez next argues that his trial counsel was deficient because counsel failed to object to the prosecutor's questions regarding Sweeney's immunity.  On direct examination the prosecutor asked Sweeney:

> What . . . is your obligation . . . under this immunity agreement?
> . . .
> What do you understand the U.S. Attorney's office has promised in exchange for your cooperation and truthful testimony?
> . . .
> [W]hat is your understanding as to what happens to you if you don't cooperate or testify truthfully in this case?

In response to the prosecutor's questions, Sweeney testified that her understanding of her immunity agreement was that she had to tell the truth or she would be prosecuted for perjury.  Defense counsel did not object.  Rodriguez claims that trial counsel's

failure to object allowed her testimony to be bolstered as being truthful.  We are unconvinced.

It is well-established that introducing into evidence an immunity agreement during direct examination is not automatically impermissible bolstering.  See United States v. McNeil, 728 F.2d 5, 14 (1st Cir. 1984) (stating that the need for immunity undercuts any bolstering of the witness's veracity); see also United States v. Gentles, 619 F.3d 75, 86 (1st Cir. 2010) (holding that the government "properly may admit a witness's plea agreement into evidence, discuss the details of the plea during closing arguments, and comment upon a witness's incentive to testify truthfully" (quoting United States v. Bey, 188 F.3d 1, 7 (1st Cir. 1999))); United States v. Martin, 815 F.2d 818, 821-22 (1st Cir. 1987) (holding that the admission of a plea agreement does not constitute bolstering).  Therefore, even if trial counsel had objected, an objection on the ground of bolstering would not have been properly sustained.  Consequently, the failure to make such an objection could not have been deficient.

This brings us to the end of our discussion of Rodriguez's ineffective assistance of counsel claim.[10]  Under

---

[10]Rodriguez also argues that defense counsel's failure to request a continuance when he learned of Sweeney's new testimony on the eve of trial and counsel's failure to conduct further investigation of her new testimony constituted a constructive denial of Rodriguez's right to counsel.  However, Rodriguez provides no support for his argument nor does he develop his argument under the Strickland standard for ineffective assistance of counsel.  Strickland, 466 U.S. at 687. Thus, this argument is

Strickland, Rodriguez has the burden of showing both deficient performance and prejudice. 466 U.S. at 687. Because Rodriguez has failed to show his trial counsel performed deficiently, his ineffective assistance of counsel claim fails. See Tevlin, 621 F.3d at 66 ("A defendant's failure to satisfy one prong of the Strickland analysis obviates the need for a court to consider the remaining prong.").

B. Rodriguez's First Motion for a New Trial -- Jury Taint

1. Standard of Review

We review the district court's denial of a motion for a new trial for an abuse of discretion. See United States v. Boylan, 898 F.2d 230, 262 (1st Cir. 1990).

We review the district court's response to allegations of improper influence upon the jury under the same standard -- abuse of discretion. See id. While the "district court is obliged to investigate plausible allegations of improper influence on a jury verdict," the court nonetheless "has broad discretion to determine the type of investigation which must be mounted." United States v. Meader, 118 F.3d 876, 880 (1st Cir. 1997) (internal quotation marks omitted); see Mahoney v. Vondergritt, 938 F.2d 1490, 1492 (1st Cir. 1991); see also United States v. Corbin, 590 F.2d 398, 400 (1st

deemed waived. Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("a litigant has an obligation 'to spell out its argument squarely and distinctly,' or else forever hold its peace") (quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) (internal citation omitted)).

Cir. 1979) ("A district court has broad, though not unlimited, discretion to determine the extent and nature of its inquiry into allegations of juror bias."). "The trial judge may, but need not, convene a fullblown evidentiary hearing." Boylan, 898 F.2d at 258. Instead, the court's "primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." Id.; see also United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442-43 (1st Cir. 1993).

 2.  Discussion

 a.  Confrontation Clause Argument

        Rodriguez claims that the presence of the Bible in the jury room violated his Sixth Amendment right to confront the witnesses against him because the "Confrontation Clause requires that a jury verdict must be based on the evidence developed at trial." According to Rodriguez, the Confrontation Clause implies that the evidence against him must come from the witness stand in a public trial where there is complete judicial protection of his constitutional rights, particularly, the right to confront the witnesses against him. Accordingly, he contends that "these critical components of the Sixth Amendment" require that "extrinsic information or influences upon a jury's deliberations [be regarded] as presumptively prejudicial."[11]

---

[11]The Sixth Amendment gives all defendants in criminal proceedings the right to trial by an impartial jury and the right

-20-

Given Rodriguez's cursory treatment of this issue, approximately half a page, which we note stands in sharp contrast to his treatment of his impartial jury argument, we are unable to discern what his exact Confrontation Clause argument is. Though he cites a few Supreme Court cases for support, our review of those cases does nothing to shed light on his argument. Moreover, we note that this argument is so poorly presented, the government fails to mention it even once in its fifty-five page brief. In any event, it is not the job of this court to do Rodriguez's work for him and we decline to do so. Accordingly, this argument is deemed waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); see also Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks and citation omitted)).

b.  Impartial Jury Argument

Rodriguez also argues that the presence of the Bible in the jury room during the course of his trial was extrinsic

---

to be confronted with the witnesses against them. U.S. Const. amend. VI.

information that improperly influenced the jury in violation of his constitutional right to a trial before an impartial jury. According to Rodriguez, "[t]he Bible is, not just any book, as to millions of people, it is a primary source of moral teaching and a source of 'divine' law that surpasses all other law, including federal criminal law." Consequently, he argues that its presence in the jury room during deliberations necessarily impacted the jury's impartiality because they were improperly influenced by matters -- the scripture -- external to the trial proceedings. According to Rodriguez, the Bible's presence in the jury room was "presumptively prejudicial" and "requires a new trial in the interest of justice" because an eight-day trial was followed by almost four days of jury deliberations, including two separate communications to the court indicating that the jury could not reach a decision. Because the jury returned a verdict of guilty a few hours after the court delivered an <u>Allen</u> charge,[12] Rodriguez argues that "[t]hese facts give rise to a strong inference that the Bible played a role in the post-<u>Allen</u> charge deliberations leading to the verdict" and that "[a] new trial is the appropriate remedy."

In further support of his argument he contends that the district court's investigation into the amount of influence, if any, that the Bible had on jury deliberations and the extent of any

---

[12]An <u>Allen</u> charge is an instruction given to a jury that is having difficulty agreeing on a verdict. <u>Allen</u> v. <u>United States</u>, 164 U.S. 492, 501 (1896).

-22-

taint which may have resulted was inadequate. Relying heavily on this court's decision in United States v. Lara-Ramirez, 519 F.3d 76 (1st Cir. 2008), Rodriguez argues that (1) the trial judge erred by refusing to conduct an individual voir dire of every juror to see if the Bible had any influence on the jury's deliberations, and (2) the trial judge's decision to call back only the foreperson to testify at a hearing on the matter was insufficient to dispel any concern that the jurors were exposed to an improper, external influence.[13]  Therefore, according to Rodriguez, at the very least "[t]he case must be remanded to the district court to recall each juror for individual voir dire [in order] to investigate the nature and extent of the taint."  We disagree with Rodriguez's assertion that he is entitled to a new trial, as well as his alternative argument that he is entitled to a remand to the district court.

In Lara-Ramirez, the court reporter informed the court that she had seen a Bible in the jury room while she was reading the transcript to the jury -- this was in response to the jury's letter to the court requesting the transcript of the defendant's

_____

[13]Two additional cases relied upon by Rodriguez are equally unavailing.  Unlike the facts of this case, in Oliver v. Quarterman, 541 F.3d 329, 331-32, 339 (5th Cir. 2008), cert. denied, 129 S. Ct. 1985 (2009), there was evidence that the jury actually used the Bible during deliberations. Likewise, in Meader, 118 F.3d at 878-80, we held that a district court's response to an allegation that a defense witness spoke to a juror's son, which consisted of reviewing the voir dire transcript and interviewing the juror, was a "textbook model of conscientiousness." We did not require the court to go so far as to interview the son. Id. at 880-81.

testimony. Id. at 79. Thereafter, the jury sent a second letter to the court saying it was deadlocked. Id. With counsel for both sides present, the court questioned the jury foreperson about the Bible and its use in the jury's deliberation. Id. at 80. The court's questioning of the jury foreperson established that the juror who brought the Bible into the jury room "used the Bible in deliberations" and urged the other jury members to "hear the facts, but also consider what God says in the Bible," or "something like that." Id. at 80. Despite defense counsel's suggestion to conduct individual interviews with each of the jurors and to provide a curative instruction directing the jury to disregard anything discussed in reference to the Bible, the court declared a mistrial[14]. Id. at 80-81.

We held that the district court committed an abuse of discretion and remanded with instructions to vacate the defendant's conviction.[15] Id. at 89. While "we recognize[d] that the presence of the Bible in the jury room posed an unusual situation for the

---

[14]On appeal to this court, the defendant argued that he did not consent to a mistrial due to the presence of a Bible during jury deliberations in his first trial and therefore, his motion to dismiss his second trial on double jeopardy grounds should have been granted. Lara-Ramirez, 519 F.3d at 79.

[15]Because the district court erred in declaring a mistrial, we found that it also erred in denying the defendant's motion to dismiss his second trial on double jeopardy grounds. Consequently, on remand, we instructed the district court to not only vacate the defendant's conviction, but to also dismiss the indictment. Lara-Ramirez, 519 F.3d at 89.

-24-

district court," we nonetheless stated "that the inquiry conducted by the court was inadequate to support a finding that a mistrial was manifestly necessary." Id. at 86. In so holding, we noted that "[t]he court questioned only the court reporter and the jury foreperson," and stated that this "minimal investigation" was insufficient to "establish[] the magnitude of the 'taint-producing event' and the 'extent of any resultant prejudice.'" Id. (quoting United States v. Bradshaw 281 F.3d 278, 289 (1st Cir. 2002)).

Lara-Ramirez is distinguishable from the present case. Here, after consulting with counsel, the district court held a hearing at which the foreperson, under oath, testified. Unlike the foreperson's testimony in Lara-Ramirez, in response to the district court's questions concerning the presence and use of the Bible during jury deliberations, the foreperson in this case testified that as far as she could remember the Bible did not come up at all during deliberations she led, nor did she recall ever seeing it open. Based on the foreperson's testimony, the district court found the hearing sufficient to dispel any concern that the Bible had been used during deliberations and that the jury had been improperly exposed to an extraneous influence. With "no evidence of any extraneous influence on [the] deliberations," the district court declined to "haul" in the rest of the jury in order to conduct an individual voir dire of each one for the sole "purpose[]

-25-

of investigating the possibility of misconduct that [was], at best, wholly speculative." This decision was not an abuse of discretion.

Let us be clear. Lara-Ramirez does not stand for the proposition that a judge must conduct an individual voir-dire of each and every juror in any circumstance where a Bible or some other extrinsic material is argued to have improperly influenced the jury. Rather, based on the specific facts of Lara-Ramirez, we found that the district court judge abused his discretion by not doing more to determine the extent of any improper jury influence on the broader panel before concluding that no curative instruction could remove any possible jury taint. 519 F.3d at 86-89. It is the circumstances of each case that will determine the level of inquiry necessary. However, what is required, as was done here, is that the judge conduct enough of an investigation to eliminate any lingering uncertainty as to whether any extrinsic information was used to improperly influence the jury. Id. at 86. In this instance, the district court's decision to question only the foreperson was adequate and well within its discretion. Consequently, the district court's denial of Rodriguez's motion for a new trial and its refusal to conduct an individual voir dire of each juror was not an abuse of discretion.

C. Rodriguez's Second Motion for a New Trial - Prosecutorial
   Misconduct

As we previously stated, we review the district court's denial of a motion for a new trial for abuse of discretion. See Boylan, 898 F.2d at 262; see also discussion supra, Part II.B.1.

1. Closing Argument

a. Standard of Review

We review de novo whether an objected-to statement was improper. United States v. Ayala-Garcia, 574 F.3d 5, 16 (1st Cir. 2009). If we conclude that the statement was improper we "must then determine whether [it] resulted in prejudice to the defendant." United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007); see also United States v. Joyner, 191 F.3d 47, 53 (1st Cir. 1999) (stating that harmless error review is a review of whether the argument resulted in adequate prejudice to warrant a new trial).

b. Discussion

During closing argument the prosecutor argued, as the last step in a nine step argument:

> [The defendant] acted like a guilty man. What did he do? Did he come forward and say, "You got the wrong person. I had nothing to do with it"? Did he come forward and say, "Look, all right, I lied when you stopped me, but here's the reason why. Here's what I was really concerned about"? Did he do anything like that? No.

Rodriguez argues that the prosecutor's statements violated his Fifth Amendment right against self-incrimination by taking the burden of proof away from the government, placing it upon Rodriguez, and requiring him to have affirmatively "claimed his innocence to the police, by saying 'It was not me.'" Rodriguez further argues that the prosecutor's statements were not an "invited reply" in response to defense counsel's argument and that the district court's curative instruction was not enough to "eliminate the harmful prejudice" caused by the prosecutor's remarks. As such, Rodriguez alleges that the prosecutor's statements were not harmless.

Assuming without deciding that the prosecutor's statements were improper and violated Rodriguez's Fifth Amendment rights, we still must resolve whether the error was prejudicial. See United States v. Giorgi, 840 F.2d 1022, 1037 (1st Cir. 1988) ("Even were we to find the prosecutor's methods improper, that alone would not suffice to reverse the conviction . . . . [A] party must show both misconduct and resulting prejudice.") (citation omitted). "The test is 'whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial.'" Azubike, 504 F.3d at 39 (quoting Joyner, 191 F.3d at 54) (internal quotation marks omitted). To make this determination, we apply a three part test. See Gentles, 619 F.3d at 81-82. "First, we determine whether the prosecutor's

conduct was isolated and/or deliberate; next, we consider whether the trial court gave a strong and explicit cautionary instruction; and finally we determine whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case." Id. (internal quotation marks and citation removed).

In regard to the first prong, the prosecutor's statements were isolated and brief. The prosecutor's statements consisted of only a few sentences in twenty-six pages of closing argument. Moreover, as soon as defense counsel objected, the district court called both parties to side-bar and asked defense counsel what curative instruction counsel would like for the court to make. Thereafter, the district court gave a curative instruction[16] to the jury and the prosecutor never returned to the subject.

Further, based on our review of the record, we think the prosecutor's statements, even if improper, were not a deliberate attempt to violate Rodriguez's Fifth Amendment rights.[17] Indeed,

---

[16]The district court stated the following:

I am striking the line of argument that was just made. I want to remind you that, and I'll be talking about it again, but a defendant has a Fifth Amendment right here. We talked about that on the first day of trial. A defendant has no obligation whatsoever to say anything at all, and it is improper to consider that at all in the jury deliberation room. And so whatever he did that night, he had no obligation to say anything or do anything.

[17]The prosecutor's statements during closing focused on the time period following Rodriguez's identification as a suspect, but before he had been arrested or read his rights under Miranda.

-29-

after defense counsel's objection and while at side-bar, the prosecutor stated that he would tell the jury that Rodriguez had a constitutional right to remain silent and that Rodriguez had no obligation to come forward to police.[18]

Moving along to the second prong, though in general prejudicial statements made during closing argument "militate in favor of reversal," here a strong curative instruction was given immediately after the objection. Azubike, 504 F.3d at 39 (quoting United States v. Manning, 23 F.3d 570, 575 (1st Cir. 1994)) (internal quotation marks omitted). "This court has repeatedly held that a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct." United States v. Riccio, 529 F.3d 40, 45 (1st Cir. 2008). Moreover, "[i]t is a well

---

Miranda v. Arizona, 384 U.S. 436, 467-68 (1966). We note that the law concerning a prosecutor's use of a defendant's pre-arrest, pre-Miranda silence is, to say the least, unsettled. See United States v. McCann, 366 F.3d 46, 56-57 (1st Cir. 2004), vacated and remanded on other grounds, 543 U.S. 1104 (2005), (stating that the issue of a prosecutor's use of a defendant's pre-arrest, pre-Miranda silence has not been definitely resolved by this court); compare United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991) (finding plain error where court allowed admission of IRS agent's testimony regarding the defendant's silence during a non-custodial interrogation), with United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991)("The government may comment on a defendant's silence if it occurred prior to the time he was arrested and given his Miranda warnings.").

[18]The prosecutor never did make such a statement to the jury. Immediately following the side-bar, the court gave a curative instruction and the prosecutor moved on with his argument.

established tenet of our judicial system that juries are presumed to follow such instructions."  Gentles, 619 F.3d at 82; see also United States v. Salley, 651 F.3d 159, 167 (1st Cir. 2011) ("We assume the jury to have followed [the court's] instructions.").

> Here, the district court stated:

> I am striking the line of argument that was just made.  I want to remind you that, and I'll be talking about it again, but a defendant has a Fifth Amendment right here. We talked about that on the first day of trial.  A defendant has no obligation whatsoever to say anything at all, and it is improper to consider that at all in the jury deliberation room.  And so whatever he did that night, he had no obligation to say anything or do anything.

Rodriguez failed to object to the instruction given.  Additionally, during the court's closing charge to the jury, it informed the jury that the defendant had an "absolute right not to testify," that the jury was not to draw "any inference whatsoever" from the defendant's silence, and that "closing arguments made by the lawyers [were] not evidence."  We think these instructions were enough to "properly account[] for possible prejudice and [that] no reversible error was committed."  United States v. Hodge-Balwing, 952 F.2d 607, 611 (1st Cir. 1991); see also Azubike, 504 F.3d at 42 (noting, in vacating and remanding, that "this would have been quite a different case if the district court had corrected the error in the prosecutor's statement").

Finally, applying prong three, we think the evidence presented at trial was strong enough to establish that any ill effects which survived the curative instruction did not affect the outcome of the case. To begin, Sweeney and Garofalo corroborated each other's testimony, establishing that the defendant had possession of the car on the night it was found. Additionally, Sweeney's testimony indicated that the defendant had possession of the AK-47 the day before it was found in the car. These two pieces of evidence, coupled with the evidence of the marijuana and drug paraphernalia in the car, and the testimony that Rodriguez had taken the car to go sell drugs, was sufficient evidence for a jury to find that the defendant was in possession of the AK-47 despite the prosecutor's statements during closing arguments. When all is said and done, "[c]onsidering the evidence in this case, the terse character of the remarks and the thorough curative [and general] instructions given by the court, it is unlikely that the remarks altered the result of the trial." Riccio, 529 F.3d at 46 (internal quotation marks and citation omitted). Consequently, the prosecutor's statements, while arguably improper, did not so poison the well as to require a new trial. Azubike, 504 F.3d at 39.

2. Rebuttal

a. Standard of Review

We review only for plain error any part of the government's rebuttal argument which the defendant failed to object

to.  United States v. Kinsella, 622 F.3d 75, 83.  Under this exacting standard the defendant must show that there was an error, which was obvious, and which affected the outcome of the case. Id. "Even if a defendant can show all of this, we have discretion not to intervene if we conclude that the error does not distort the fairness or integrity of the lower court proceedings in some extreme way." Id.  The "result is that plain error review tends to afford relief . . . only for 'blockbuster' errors."  Moran, 393 F.3d at 13 (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)).

b. Discussion

In order to address properly whether the prosecutor's statements were in error and affected the outcome of the case we think it is necessary to put them in context. During closing argument, while contesting the truthfulness and trustworthiness of the prosecution's witnesses, the defendant's trial counsel stated:

> So ask yourselves this: Would you trust either of them to take care of your kids?  Would you trust either of them to back you up in an important task at work?  Would you trust either of them to even, like, tell you what your boss had instructed that you should be doing?  I think it's probably likely, isn't it, that you probably wouldn't even trust these people to walk your dog?

This statement was made at the very end of the defendant's closing argument.  Immediately after, the prosecutor made the following remarks during his rebuttal:

-33-

[L]et me begin by posing a rhetorical question that follows on what [defense counsel] just asked of you. Would you trust me to watch your kids? You don't know me from Adam. I may look like a respectable person, but that doesn't mean you're all of a sudden going to welcome me into your household and entrust me with things that are important to you.

The defendant argues that the prosecutor's statements improperly vouched for the credibility of the government's case and its witnesses by injecting the prosecutor's personal trustworthiness into the "witness credibility equation." According to Rodriguez, "[t]he thrust of the prosecutor's argument was that the jurors could trust [the prosecutor] for purposes of the trial even though they may not trust him with their children and therefore, the jurors could trust the testimony of [the] government's witnesses, even though the jurors may not trust the witnesses in personal matters." Furthermore, Rodriguez contends that the vouching was more pronounced and prejudicial because the statements occurred during rebuttal. We disagree.

"Improper vouching occurs when the government 'place[s] the prestige of the United States behind a witness by making personal assurances about the credibility'" of its witnesses or implies that its evidence should be trusted because the government is trustworthy. United States v. Robinson, 473 F.3d 387, 396 (1st Cir. 2007) (quoting United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st Cir. 2000)). We have acknowledged that the problem with improper vouching is that by placing the credibility of counsel at

issue, the government is given an unfair advantage. Joyner, 191 F.3d at 55; United States v. Cresta, 825 F.2d 538, 555 (1st Cir. 1987). We have held that improper statements during rebuttal increase the likelihood of prejudice. Ayala-Garcia, 574 F.3d at 20. However, that is not the situation here.

In this case, the prosecutor's statement did not put his personal credibility at issue. Instead, the prosecutor merely posed a rhetorical question that mirrored, and directly responded to, the defendant's closing argument. See United States v. Skerret-Ortega, 529 F.3d 33, 40 (1st Cir. 2008) ("The Government's response to statements made by defendant's counsel cannot and should not be viewed the same way as statements made by the Government without provocation. . . . [W]e 'typically cede prosecutors some latitude in responding to defense counsel . . . .'" (quoting United States v. Hansen, 434 F.3d 92, 102 (1st Cir. 2006), cert. denied, 549 U.S. 894 (2006)) (internal quotation marks removed)). Our review of the record suggests that the prosecutor's intention was to demonstrate the difference between trusting someone to watch your children and finding them credible. It appears the prosecutor, using himself only as an exemplar, was attempting to illustrate his point by suggesting that whether the jurors trusted a person had nothing to do with that person's credibility and everything to do with how well the jurors knew the

person.[19]  Contrary to Rodriguez's claim, the prosecutor did not imply that the government's witnesses were trustworthy because he himself was trustworthy or because they were witnesses for the United States.  There was no improper vouching.

Before leaving this matter we note that while the defendant objected to the prosecutor's statements during closing argument, he failed to object to the prosecutor's statements during rebuttal.  This suggests that even the defendant "failed to regard the comments as having a damaging effect."  Gentles, 619 F.3d at 84; see United States v. Procopio, 88 F.3d 21, 31 (1st Cir. 1996) ("The fact that the defense did not object also may suggest that, in the conditions of the courtroom, the passage in question passed by as mere rhetoric.").

Furthermore, when a defendant fails to object at trial we are not inclined to find improper meaning in a prosecutor's statement if there is a plausible alternative.  See United States v. Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993) ("[I]n the absence of a contemporaneous objection it seems fair to give the [prosecutor] the benefit of every plausible interpretation of [his] words."); United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995) (stating that when a prosecutor's comments are susceptible to more than one meaning, context often determines meaning and that a reviewing court should construe ambiguity in favor of the meaning

---

[19]A practice which we discourage.

which is "unexceptionable"); see also Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). Here, the plausible alternative is that the prosecutor simply meant to illustrate the difference between trusting someone and finding them credible. While it may have been wiser for the prosecutor to leave any reference to himself out of the case entirely, his statements were not improper vouching, but instead an attempt to demonstrate a flaw in the defendant's logic. Consequently, there was no "blockbuster" error that would warrant reversal.[20]

III. Conclusion

For all of the aforementioned reasons, we **affirm**.

---

[20]Rodriguez makes one final argument. He alleges that even if all the errors he points to are not sufficient on their own for reversal, combined, they amount to cumulative prejudicial error. We disagree. Because none of Rodriguez's claimed errors resulted in any substantial prejudice there was no cumulative error. See United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007) (holding that where none of the district court's "individual rulings worked any cognizable harm" to the defendant's rights, cumulative error argument was meritless); see also United States v. DeMasi, 40 F.3d 1306, 1322 (1st Cir. 1994) ("Because we have found that none of [the defendant's] individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error.").