# United States Court of Appeals
## For the First Circuit

No. 14-1088

UNITED STATES OF AMERICA,

Appellee,

v.

FRANK PEAKE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lynch, and Thompson,
Circuit Judges.

David Oscar Markus, with whom Mona E. Markus, A. Margot Moss, and Markus & Markus, PLLC, were on brief, for appellant.
Shana M. Wallace, Attorney, U.S. Department of Justice, Antitrust Division, with whom William J. Baer, Assistant Attorney General, Brent Snyder, Deputy Assistant Attorney General, Craig Y. Lee and James J. Fredricks, Attorneys, U.S. Department of Justice, Antitrust Division, were on brief, for appellee.

October 14, 2015

**TORRUELLA, <u>Circuit Judge</u>.** As a result of his conviction for participating in one of the largest antitrust conspiracies in the history of the United States, Defendant-Appellant Frank Peake ("Peake") raises a number of claimed errors with respect to his trial and sentencing for a serious price-fixing offense in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"). Peake challenges: (1) the validity of his indictment; (2) the scope of the search warrant executed by the government; (3) the district court's denial of his pre-trial motion to change venue; (4) improper remarks made by the prosecutor during trial; (5) the district court's ruling permitting prejudicial testimony; (6) the district court's denial of his request for a theory-of-defense instruction; (7) the district court's denial of his request for a mistrial during jury deliberations, and (8) the length of his sentence, which was based on the amount of commerce affected by the charged conspiracy, and which Peake contends the court incorrectly computed. Finding no errors and concluding that the district court marshaled this trial in a commendable manner, we affirm. After a brief overview of the factual background, we will take each of the issues one by one.

## I. Background

We recount the facts in the light most favorable to the jury verdict, as supported by the record. <u>See</u> <u>United States</u> v. <u>Andrade</u>, 94 F.3d 9, 10 (1st Cir. 1996). Since 2002, waterborne

cabotage between Puerto Rico and the mainland has been dominated by four freight carriers: Horizon Lines, Sea Star, Crowley, and Trailer Bridge. See In re Puerto Rican Cabotage Antitrust Litig., 815 F.Supp.2d 448, 454 n.3 (D.P.R. 2011). And, because of Puerto Rico's geographical situation, Puerto Rico's consumers rely on these carriers to transport most goods imported to the island. See Merchant Marine Act of 1920, Pub. L. No. 66-261, 41 Stat. 988, 999 (1920) (codified as amended at 46 U.S.C. §§ 55101, et seq.). Seeking to maximize revenues, Horizon Lines and Sea Star agreed not to undercut each other in price and allocated precise market share quotas through an extensive conspiracy that included bid rigging and careful planning, coordination, and the kinds of day-to-day self-enforcement common of illegal agreements.

This behavior constituted an agreement in restraint of trade forbidden by Section 1. Peake, the former President and Chief Operating Officer ("COO") of Sea Star, played a managing role in the conspiracy, coordinating with competitors through meetings, phone calls, and emails, and attending to pricing or consumer-allocation disputes that his subordinates could not resolve on their own.

For example, during a meeting in Orlando in 2006, Peake coordinated with Horizon Lines executives to resolve existing disputes by agreeing to keep the market shares at their current levels, rather than reinstating the split in effect prior to his

-3-

joining the conspiracy in 2005. Later that year, the market allocation became imbalanced when Walgreens, a major importer of consumer goods to Puerto Rico, decided not to divide freight contracts between Horizon Lines and Sea Star, and instead allocated all of its freight to Horizon Lines. Peake quickly agreed with an executive from Horizon Lines that the company would compensate by shifting cargo to Sea Star vessels or using Transportation Service Agreements, whereby Horizon Lines would pay Sea Star to carry its cargo even though it had capacity to transport it in its own vessels.

While the conspiracy was in full swing, a Sea Star senior executive working with Peake became a government informant. Based on his description of the conspiracy, the government initiated an extensive investigation that included an FBI search of Sea Star's headquarters in 2008. Four of Peake's co-conspirators were charged with antitrust violations and pleaded guilty before the U.S. District Court for the Middle District of Florida, Jacksonville Division. Following these events, a grand jury in San Juan, Puerto Rico, returned an indictment against Peake in November 2011 on one charge of conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for freight services in interstate commerce between the United States and Puerto Rico.

Peake's co-conspirators testified against him at trial, revealing his involvement in the conspiracy and their discussions

about setting surcharges, fees, and market share allocations.  One such incident involved an email exchange between Peake and a competitor regarding prices offered to a client in an attempt to "avoid a price war."

After a nine-day trial, which took place over the course of three weeks, the jury found Peake guilty of participating in a conspiracy to fix the prices of Puerto Rico freight services, in violation of Section 1.  The district court sentenced Peake to sixty months' imprisonment.

This appeal ensued.

## II.  The Indictment

Before addressing the main issues in this appeal, we briefly address an issue that, although Peake is raising on appeal for the first time, he claims would foreclose our jurisdiction on this matter.[1]  Peake argues that Puerto Rico is not a state, yet the indictment charges Peake under Section 1, which prohibits agreements in restraint of trade or commerce "among the several

_____

[1]   "[J]urisdictional challenges to an indictment may be raised at any time," United States v. Rosa-Ortiz, 348 F.3d 33, 36 (1st Cir. 2003), but all other motions regarding a defective indictment, such as failure to state an offense, must be made before trial, Fed. R. Crim. P. 12(b)(3)(B), and thus can only be reviewed for plain error if raised for the first time on appeal, see United States v. Turner, 684 F.3d 244, 255 (1st Cir. 2012).  Here, it matters not whether we treat Peake's argument as a jurisdictional challenge, or as an untimely-made failure-to-state-a-claim argument to be reviewed for plain error, because, as we explain, Peake was correctly charged under Section 1, so there was no error at all.

-5-

States," and that his conviction must therefore be vacated.[2]  There are at least two insurmountable problems with this argument. First, it is well-settled that, for purposes of the Sherman Act, Puerto Rico is "to be treated like a state and not like a territory," therefore, Section 1 fully applies to Puerto Rico. Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 38, 44 (1st Cir. 1981).  Second, the evidence in the record shows that part of the freight carried by the companies in the conspiracy originated in one state before being transported to a port in a second state to be shipped to Puerto Rico. Therefore, the commerce affected by the conspiracy was not only between a state and Puerto Rico, but also among the states.  Thus, Peake was correctly charged, and the indictment is not defective.

We now move on to Peake's appeal of the district court's denial of his motion to suppress, and then address his other trial-related claims, before finally turning to the appeal of his sentence.

---

[2]  Peake argues that he should instead have been charged under Section 3 of the Sherman Act, which contains the same prohibitions, but applies to territories.  15 U.S.C. § 3(a) ("Every . . . conspiracy[] in restraint of trade or commerce . . . between any such Territory and another, or between any such Territory or Territories and any State or States . . . is declared illegal.").

### III. Motion to Suppress

Peake appeals the district court's denial of his motion to suppress the government's search of his personal electronics. For the following reasons, we affirm the denial.

### A. Standard of Review

In reviewing a challenge to the district court's denial of a motion to suppress, "we view the facts in the light most favorable to the district court's ruling," and "review the district court's findings of fact and credibility determinations for clear error." United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (citation and internal quotation marks omitted). However, we review the lower court's legal conclusions, including its determination of whether the government exceeded the scope of the warrant, de novo. United States v. Fagan, 577 F.3d 10, 12–13 (1st Cir. 2009).

A search warrant must "describ[e] the place to be searched" and the "things to be seized." U.S. Const. amend. IV. The authority conferred by the warrant "is circumscribed by the particular places delineated in the warrant and does not extend to other or different places." Fagan, 577 F.3d at 13. Search warrants also have a specificity requirement, meaning "that warrants shall particularly describe the things to be seized," which "prevents the seizure of one thing under a warrant describing another." Marron v. United States, 275 U.S. 192, 196 (1927). Even

though search warrants are limited to the particular places and things described in them, there is some breathing room in our analysis, since "search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided." United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986) (citing Spinelli v. United States, 393 U.S. 410, 419 (1969)).

A draft warrant presented to a magistrate judge may be altered or modified by the judicial officer or at his direction. See United States v. Hang Le-Thy Tran, 433 F.3d 472, 481 (6th Cir. 2006); United States v. Katoa, 379 F.3d 1203, 1208 (10th Cir. 2004); United States v. Arenal, 768 F.2d 263, 267 (8th Cir. 1985). When part of a warrant is considered invalid, "evidence seized under the valid portion may be admitted." United States v. George, 975 F.2d 72, 79 (2d Cir. 1992). Furthermore, when a warrant is limited to authorize the seizure of only certain objects, "container[s] situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." United States v. Rogers, 521 F.3d 5, 9-10 (1st Cir. 2008).

**B. The Search Warrants**

In this case, a magistrate judge was presented with a draft warrant for his consideration. Upon reviewing it, he crossed

out a paragraph under Attachment A, which described the premises to be searched. The stricken paragraph allowed the search of "briefcases, laptop computers, hand-held computers, cell phones, Blackberries, and other movable document containers found on the premises described."[3] In Attachment B, the magistrate judge also struck the following text from the description of the property to be seized: "memory calculators, pagers, personal digital assistants such as Palm Pilot hand-held computers." The magistrate judge left standing, however, other references to electronically stored documents and records. As amended, Attachment B described the property to be seized as follows:

> As used above, the terms records, documents, programs, documentation, applications or materials include but are not limited to records, documents, programs, applications or materials created, modified or stored in any form, including any optical, electrical, electronic, or magnetic form (such as any information on an optical, electrical, electronic or magnetic storage device), including floppy disks, hard disks, ZIP disks, CD-ROMs,

---

[3] The full text of the paragraph struck stated:

> In order to minimize the prospect of the removal and subsequent destruction of any of the documents and records identified in Exhibit B to the Search Warrant, the search will include the briefcases, laptop computers, hand-held computers, cell phones, Blackberries, and other movable document containers found on the premises described above, and in the possession of, or readily identifiable as belonging to SEA STAR management, pricing, and sales personnel including, but not limited to, FRANK PEAKE, PETER A. BACI, CARL FOX, NED LAGOY, NEIL PERLMUTTER, ALEX CHISHOLM, MIKE NICHOLSON, EDWARD PRETRE, and WILLIAM BYRNES.

> optical disks, backup tapes, printer buffers or other
> device memory buffers, smart cards . . . email servers,
> as well as opened and unopened e-mail messages and any
> printouts or readouts from any optical, electrical,
> electronic, or magnetic storage device . . . .

Additionally, the magistrate judge added two handwritten passages to the portion of the draft warrant governing the seizure of computers and other electronic devices, and ordered that any seized computers or electronic devices within the scope of the warrant be returned within thirty days of seizure. Specifically, the following language was inserted:

> In the event that computer equipment and other electrical
> storage devices must be transported to the appropriate
> laboratory, rather than searched on the premises, the
> search of computer equipment and other electronic storage
> devices must be completed within 30 days of seizure.

and

> If no evidence is found in the computer equipment and
> electronic storage devices by the end of the 30 day
> period, or if any electronically stored information is
> outside of the scope of the warrant, such shall be
> returned promptly.

Following the guidance provided in the warrant, the FBI raided Sea Star's headquarters on April 17, 2008, and seized Peake's personal laptop and Blackberry. The items were imaged (the data was copied) and returned to Peake on-site the same day. This evidence was not immediately reviewed, as the FBI was under the impression that Sea Star's servers stored copies of all seized information relevant to the investigation. Images of Peake's computer and Blackberry were eventually sent to the Department of

Justice in Washington, D.C.  More than four years passed before the government sought and obtained another search warrant from a magistrate judge in Washington, D.C., authorizing a search of these data copies.  Their review revealed emails tying Peake to the conspiracy, which the government submitted as evidence at trial.

## C.  Appeal of the Suppression Ruling

Peake argues that the information collected from his personal computer and Blackberry should be suppressed because the two items were outside the scope of the initial warrant, and therefore illegally seized.  He contends that when the magistrate judge struck the paragraph in Attachment A specifying computers and Blackberries as places that could be searched, doing so specifically disallowed any search and seizure of said items.  A good faith exception to the purported violation of the initial warrant, Peake continues, cannot apply in the present case where the property seized was expressly disallowed by the issuing magistrate judge.

Peake also argues that the government did not have authority to image the seized electronics, and that the second warrant from the magistrate judge in Washington, D.C., did not cure the violation because it could not authorize a search of material outside the scope of the original warrant, especially after the thirty days permitted by the first warrant had passed.

### 1.  The First Warrant

Applying de novo review, we conclude that the information collected from the computer and Blackberry was within the scope of the original search warrant.  We think Peake is mistaken in his reliance on the stricken paragraph; other, intact passages in the warrant expressly demonstrate that the magistrate judge approved searching for all documents and records that pertained to the conspiracy stored in "an electronic or digital format."  That the warrant listed documents stored in electronic form on an electronic storage device, including email messages, and referred in Attachment B to Blackberry address books, confirms the legality of the FBI's search.

This case is analogous to United States v. Rogers, where we held that the government's seizure of a videotape was valid, even though videotapes were not listed in the warrant, because the warrant mentioned "photos," and a videotape was a plausible repository for a photo.  521 F.3d at 10.  Or United States v. Giannetta, 909 F.2d 571, 577 (1st Cir. 1990), where we held that the officers could look in movable containers and wherever they had reasonable suspicion to think "documents could be hidden, which would include pockets in clothing, boxes, file cabinets and files," because "[a]s to document searches especially, the easily concealed nature of the evidence means that quite broad searches are permitted."

Here, given that Peake's personal electronic devices were on the premises to be searched, and the warrant specifically mentioned electronically-stored documents, the FBI acted within the scope of the warrant when it searched Peake's devices. And the fact that the issuing magistrate judge had hand-written on the warrant that computers and electronic devices must be returned within thirty days is evidence enough that the scope of the warrant included these objected-to items. Futhermore, the government's imaging of the computer and Blackberry did not constitute a warrantless seizure because doing so was contemplated by the original warrant, which explicitly authorized the government to seize electronically-stored emails and documents.

Nor does the fact that the magistrate judge crossed out language in the warrant affect our conclusion. The warrant authorized a search of the "premises" of Sea Star's headquarters; thus, as the district court held in denying the motion to suppress, the magistrate judge could have reasonably crossed out the items mentioned in Attachment A, "briefcases, laptop computers, hand-held computers, cell phones, Blackberries and other movable document containers," in order to indicate that the government should not be limited to searching solely in those places for records documenting the conspiracy, but should be permitted to search the entire premises. See, e.g., United States v. Bradley, 644 F.3d 1213, 1266

(11th Cir. 2011) (observing that warrant to search "premises" permitted search of the entire building).

As to the magistrate judge's crossing out of "personal digital assistant" in Attachment B, we conclude that the crossed-out text should simply be treated as nonexistent.[4]  Peake does not point us to any case law establishing that eliminating a part of the text from a draft warrant necessarily means that the crossed-out statements have continued significance.  Cf. United States v. Thomas, 489 F.2d 664, 672-73 (5th Cir. 1973) (stating that where a magistrate judge crossed out "in the daytime" while leaving the phrase "at any time in the day or night," the warrant "could be served at any time, day or night").  Thus, the agents would have been permitted to seize Peake's Blackberry, so long as the remaining text of the warrant was valid and authorized them to do so.  As we explained above, the seizure and search of the Blackberry was authorized by the intact paragraphs of the warrant. We therefore conclude that the Blackberry was also lawfully seized and searched.

_____

[4]  Alternatively, the magistrate judge may have intended to eliminate personal items from the search, and limit the agents to seizing company property only.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395 n.7 (1971) ("[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." (quoting Marron, 275 U.S. at 196)).  But Peake does not appear to argue that the information from his computer and Blackberry should have been suppressed because they were personal, and not company property, so we will not go down this road.

## 2.  The Second Warrant

Peake correctly argues that if his computer and Blackberry had been illegally seized, the government should not have been permitted to later obtain a more expansive warrant from an arguably friendlier forum in order to search previously-excluded items, as doing so would weaken important Fourth Amendment protections.  But here, we have concluded that the seized and imaged evidence Peake seeks suppressed was within the scope of the first warrant.  We do not find that the government used the second warrant to unlawfully sidestep the first one, and we need not consider whether the second warrant was invalid.  Nor do we need to reach the question whether the good faith exception applies.  In sum, the suppression motion was properly denied.  We turn now to Peake's pre-trial motion for change of venue.

## IV.  Motion for Change of Venue

Because Peake was indicted in Puerto Rico -- while his co-conspirators' cases were brought in Jacksonville, Florida -- Peake filed a pre-trial motion for change of venue under Federal Rule of Criminal Procedure 21(b) "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b).  In his motion, Peake discussed the factors considered in Platt v. Minnesota Mining & Manufacturing Co., 376 U.S. 240, 243-45 (1964), stressing that it was impracticable to hold a trial in Puerto Rico, since most persons

involved in the conspiracy and the investigation were in Jacksonville. See also United States v. Quiles-Olivo, 684 F.3d 177, 184 (1st Cir. 2012) (applying the Platt factors in a criminal case). Peake later filed supplemental briefing, arguing that change of venue was also proper under Federal Rule of Criminal Procedure 21(a) because it would be impossible to obtain a fair and impartial jury composed of Puerto Rican consumers.

The district court denied the motion, reasoning that any inconvenience suffered by Peake was outweighed by the interest of having the case heard in the jurisdiction most seriously affected by the conspiracy. It also explained that under Rule 21(a), transfer is a mandatory remedy if the court finds "an unacceptable level of prejudice," such as where "pervasive pretrial publicity has inflamed passions in the host community past the breaking point." United States v. Walker, 665 F.3d 212, 223 (1st Cir. 2011) (citing United States v. Angiulo, 497 F.2d 440, 440-42 (1st Cir. 1974) (per curiam)). The district court concluded that there was no pervasive pre-trial publicity inflaming the passions in the community to the point that Peake could not have a fair and impartial trial in Puerto Rico, and thus the court allowed the government to exercise its right to choose the venue at its prosecutorial discretion.

A district court's denial of the request for a change of venue is reviewed for abuse of discretion. Quiles-Olivo, 684 F.3d

at 181.  We find no such abuse in the district court's denial.
Peake did not allege any outside influence or publicity that could
have affected, from the outset of trial, the jury's consideration
of the evidence presented.  Thus, we affirm the district court's
ruling on the motion to change venue.

## V.  Trial

Peake's next set of issues on this appeal pertains to
matters that arose at trial, and can be boiled down into four
claims: the first is Peake's claim that he should have been granted
a new trial on the basis of prosecutorial misconduct, the second is
that the district court erred in permitting prejudicial testimony,
the third is that the district court erred in denying his request
for a jury instruction regarding his theory of defense, and the
fourth is that the district court should have declared a mistrial
when, during deliberations, the jury sent the judge a note stating
that it could not come to a verdict.  As we will explain, we find
no error in the district court's handling of each of these matters,
but first, we begin by providing some additional background on what
happened during the trial.

Peake's trial was held in San Juan, Puerto Rico, in
January 2013, and lasted nine days.  In its opening argument on the
second day of trial, the government made references to multiple
national retail chains and franchises whose businesses purportedly
experienced artificially higher shipping costs as a result of the

antitrust conspiracy, and stated that even the cost of school lunches had been affected by the conspiracy. Peake objected to these comments, which we will describe in more detail later, and filed a motion for mistrial. In his motion, he argued that the government had communicated to the jury that higher prices were being passed on to them as directly affected consumers, and reasoned that if jurors felt their personal financial interests were affected by the conspiracy, their judgment would be clouded. The district court took note of the motion on the morning of the third day of the trial, and granted the government three days to file its response.

As the trial continued, the government called Peake's co-conspirators, Gabriel Serra, Gregory Glova, and Peter Baci, to the stand to provide testimony that established the existence of a conspiracy. On cross-examination, Peake also elicited testimony from the co-conspirators that he argues was exculpatory, but contends that, because the jurors at this point believed themselves to be "affected consumers," they were unable to fairly consider this purported exculpatory testimony that was critical to his defense.[5]

---

[5] For example, Baci testified that, during part of the conspiracy, Peake pushed for perfectly legal strategies that would negatively affect the stability of the "Florida 50/50" arrangement -- the name given to the strategy of allocating equal market shares between Horizon Lines and Sea Star. One such pro-competition strategy that Peake had advocated for was for a third ship to serve the Puerto Rico-Jacksonville route; another was a "slap strategy" whereby Sea

On the fourth day of trial, the district judge had a discussion with the parties regarding the remarks made by the government during the opening statements when Peake raised an objection to the government calling witnesses whose retail and consumer business operations in Puerto Rico were affected by the higher shipping rates generated by the conspiracy. Peake argued that the effect on market prices for consumers had nothing to do with whether there was an agreement amongst competitors to fix their prices. That is, Peake contended that the issue before the jury should be limited to the agreement, regardless of its effects, and argued that allowing the testimony of witnesses from affected businesses was in line with the government's inappropriate remarks during opening statements that the conspiracy affected Puerto Rican consumers. The government argued that the witnesses' testimony was necessary to demonstrate the antitrust harm to <u>direct</u> consumers of the shipping companies (and not to imply that members of the public who patronized those businesses, or <u>indirect</u> consumers, were affected),[6] because the government needed to establish that the

_____

Star would pursue the business of any company that tried to steal their clients. In his testimony, Serra confirmed Baci's statement that Peake wanted to add a third ship. He also testified that Peake authorized competitive shipping rates and that their meetings were strictly legal. In addition, on the stand, Glova could not identify any direct references to Peake in his records of communications made in furtherance of the conspiracy.

[6] Generally, there is a distinction between direct and indirect consumers in antitrust cases. <u>See</u> <u>Hanover Shoe, Inc.</u> v. <u>United Shoe Mach. Corp.</u>, 392 U.S. 481, 492-94 (1968). The harm to be

conspiracy affected interstate commerce, a required element of the charged offense.

The district judge agreed that testimony regarding the effect on the witnesses' companies showed that the conspiracy had impacted interstate commerce, which was an element of the offense, and thus ruled that testimony to that effect would be allowed. However, the district court warned the prosecutors against eliciting testimony beyond that scope, and noted that the implication in the government's opening that school lunch programs, and therefore children, had been affected by the conspiracy was "really way out of bounds." The district judge also offered, notwithstanding the yet-undetermined outcome of the motion for mistrial, to give a curative instruction to the jury that day that would address Peake's concerns about the prosecutor's opening statement and clarify that jurors should not take into account the impact of the conspiracy on Puerto Rico's citizens. At the court's invitation, the parties submitted proposed curative instructions, and the district judge gave a version of the curative instruction to the jury that day.[7]

---

considered is only that to direct consumers. See Ill. Brick Co. v. Illinois, 431 U.S. 720, 752 (1977) ("Limiting defendants' liability to the loss of profits suffered by direct purchasers would thus allow the antitrust offender to avoid having to pay the full social cost of his illegal conduct in many cases in which indirect purchasers failed to bring suit.").

[7] Near the end of trial, the court issued a memorandum opinion and order denying Peake's motion for a new trial, finding no misconduct

Over Peake's objections, the government then called to the stand Gabriel Lafitte, who worked for the operator of Burger King restaurants in Puerto Rico, who testified that the conspiracy affected the costs paid by Burger King for products it sold on the island. Later in the trial, Ron Reynolds, a U.S. Department of Agriculture representative, testified to being offered "take-it-or-leave-it" rates for shipping services for food for school lunch programs in Puerto Rico.

After closing arguments, the jury began deliberations on the afternoon of Friday, January 25, 2013. While deliberating on the following Monday -- January 28 -- the jury sent the district judge two notes, in which it stated that it could not reach a unanimous agreement. The second note, delivered on Monday evening after ten hours of deliberation, stated that each juror had reached a personal verdict, but that the jury as a whole was unable to reach unanimity. After the second note, Peake asked for a mistrial and the government asked for an Allen charge,[8] both of which the district court denied. Instead, the court asked the jury to "return [the next day] to continue deliberations." On Tuesday, the

on the basis of the prosecutor's opening statement, but, even assuming misconduct, concluding that any prejudice was cured by the fact that the remarks were isolated, the jury was given a detailed curative instruction, and the objected-to statements did not bear on any elements of the charged offense.

[8] An Allen charge is "[a] supplemental jury instruction given by the court to encourage a deadlocked jury, after prolonged deliberations, to reach a verdict." Black's Law Dictionary (10th ed. 2014); see Allen v. United States, 164 U.S. 492 (1896).

-21-

jury deliberated for another three hours and finally reached a unanimous guilty verdict.

After the verdict, Peake filed a Motion for New Trial and a Motion for Judgment of Acquittal under Federal Rules of Criminal Procedure 33 and 29 respectively, arguing, <u>inter alia</u>, that the district court erred in allowing the government to appeal to jury bias and prejudice, in refusing to give a theory-of-defense jury instruction, and in ordering the jury to continue deliberations.[9] The district court denied the motions. We turn now to Peake's appeal of the district court's various trial-related rulings.

## A. Prosecutorial Misconduct

We address first Peake's argument that the district court should have granted him a new trial on grounds that the government's opening statement implied the conspiracy had impacted consumers, and therefore the jurors themselves, thus "poisoning the well."[10]

---

[9] Peake does not appeal the district court's rulings on the other issues raised in the Rule 33 and 29 motions, which challenged the district court's denials of: (1) Peake's request to submit hearsay evidence from one of the co-conspirators; (2) Peake's objection to the admissibility of financial disclosures; and (3) Peake's request for a new trial on grounds that the government had failed to disclose exculpatory evidence in violation of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).

[10] Peake additionally claims that he was incorrectly prohibited from diminishing the negative effects of those statements because the government moved successfully to prohibit him from arguing that -- despite the antitrust conspiracy -- shipping costs remained reasonable and fair. But whether the agreed-upon prices charged by the conspirators were nonetheless fair or reasonable does not affect our conclusion. A <u>per se</u> Section 1 violation is not excused

In its opening statements, the government told the jury that "most consumer goods travel to Puerto Rico from the shipping lanes" affected by the conspiracy; that the conspiracy "was so significant that it affected billions of dollars of freight to and from Puerto Rico"; and that "[b]usinesses like Burger King, Office Max and Walgreens, businesses that have stores all over Puerto Rico, they were all paying more than they should have to ship freight to Puerto Rico because Sea Star and Horizon were conspiring, not competing."  The government also told the jury that Burger King's shipping costs affected the price of hamburgers sold to customers, and that the federal government had incurred higher costs for the school lunch program, leaving it with "less money . . . to buy food for school children."  The government added that the antitrust laws under which Peake was charged had been enacted out of the "concern[] that consumers need to buy things to feed and clothe their families."

Improper remarks by prosecutors are reviewed de novo. United States v. Rodríquez, 675 F.3d 48, 61 (1st Cir. 2012) (citing United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009)). Even if misconduct occurred, we would still need to consider whether it was harmless.  United States v. González-Pérez, 778 F.3d

by a showing that the supra-competitive prices were somehow still reasonable.  United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 212-13 (1940); see also United States v. Topco Assoc., Inc., 405 U.S. 596, 610 (1972) ("[N]aked restraints of trade are [not] to be tolerated because they are well intended or because they are allegedly developed to increase competition.").

3, 19 (1st Cir. 2015), <u>cert. denied</u>, 135 S. Ct. 1911 (2015). In doing so, we determine whether the misconduct "so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." <u>Id.</u> (quoting <u>Rodríquez</u>, 675 F.3d at 62). "In making this determination, we focus on (1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant." <u>Id.</u> at 19 (citing <u>Rodríquez</u>, 675 F.3d at 62).

Here, we agree that the prosecutor's remarks were improper. We therefore direct our inquiry at whether these statements were nonetheless harmless. As we explain, because of the extent and the level of detail the district court included in its curative instruction; the fact that the district judge intervened repeatedly in the examination of witnesses to avoid any reference to end consumers; and the overwhelming amount of corroborating documentary evidence that tied Peake to the conspiracy, we conclude that the effects of the prosecutorial misconduct did not so poison the well that a new trial would be warranted.

First, the day after Peake filed his motion for a mistrial, the district court gave the jury the following comprehensive and detailed curative instruction:

> The fact that Puerto Rico may have potentially been affected or consumers and/or prices and/or business is not to be considered by [you] in your judgment as to the

-24-

innocence or guilt of the defendant.  The effect on prices or consumers in Puerto Rico is not per se an element of the [offense].

You are not to decide this case based on pity and sympathy to Puerto Rican businesses, to Puerto Rico, or to Puerto Rican consumers.

The effect on Puerto Rico only is material as to potentially establishing an effect on interstate commerce.  This case is about a potential conspiracy in violation of the antitrust law, and whether or not the defendant, Mr. Frank Peake, joined the conspiracy.

Sympathy to Puerto Rico is, therefore, to play absolutely no role in your consideration of this case.  Any statement that may have implied or that you may have understood that this is a case relating to the effect on Puerto Rico is an erroneous interpretation, and I don't want you to have that interpretation.  So, therefore, any effect on Puerto Rico is not to be considered at all.

The court's instruction was arguably more detailed than the proposed instruction Peake submitted.[11]  In addition, the district judge intervened in the questioning of the government's witnesses to prevent undue reference to the conspiracy's effect on Puerto

---

[11]  Peake's proposed curative instruction read as follows:

I would like to instruct you that this case is not about pricing effects in Puerto Rico or whether prices in Puerto Rico have gone up or down.  The only questions for you are whether there was a conspiracy as alleged in the indictment and whether Frank Peake knowingly and intentionally joined that conspiracy.  I also instruct you that the prosecutor mentioned in opening statement that this case affected Puerto Rico and Puerto Ricans. This was improper.  This case is not to be decided based on those factors.  Therefore, I instruct you to disregard those comments.  You should judge this case only on the evidence and not an appeal to sympathy or bias.  Any such attempts by the prosecution in its opening statement or in the questioning of its witnesses should be disregarded.

Rican consumers, and the instructions given to the jury after closing arguments again stressed these points. For example, they emphasized that the jury "must not be influenced by any personal likes or dislikes, prejudices or sympathy." The sixth instruction clarified that "[a]rguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they say in their opening statements . . . and at other times . . . is not evidence." And the twenty-first instruction, labeled "What Not to Consider," contained the exact same curative instruction given to the jury on the fourth day of trial, with one important addition: instead of telling the jurors that the court did not want them to "have" an "erroneous interpretation" about statements implying that this case related to the effect on Puerto Rico, the court instructed, "I sternly order you not to take such statements into consideration."

We have stated that there is no miscarriage of justice requiring a new trial when there are curative instructions and the evidence does not "preponderate[] heavily against the verdict." United States v. Manqual-García, 505 F.3d 1, 14 (1st Cir. 2007) (quoting United States v. Mooney, 315 F.3d 54, 61 (1st Cir. 2002)). The degree of consideration and effort on the part of the district court to respond to the defendant's valid concern over the prosecutors' appeal to the jury's personal interests allows us to conclude that it cured any prejudice. Indeed, curative instructions are "ordinarily an appropriate method of preempting a mistrial." United States v. Trinidad-Acosta, 773 F.3d 298, 308

(1st Cir. 2014) (quoting United States v. Sotomayor-Vázquez, 249 F.3d 1, 18 (1st Cir. 2001)). We presume that juries follow instructions, United States v. Gonzalez-Vázquez, 219 F.3d 37, 48 (1st Cir. 2000), and there is nothing in the record to suggest that the instruction regarding the government's remarks was disregarded by the jury.

The strength of the government's corroborating evidence against Peake also supports our conclusion in this matter. See Manqual-García, 505 F.3d at 14 ("Nor can we say that the cumulative effect of the alleged errors, given the curative instructions that were given and the strength of the other evidence, constitutes a miscarriage of justice."); Mooney, 315 F.3d at 60 ("[W]e note that any lingering prejudicial effect from the remarks pales in comparison with the overwhelming strength of the government's evidence against the defendant."). Here, the government's case was robust. The testimony of co-conspirators and direct customers of the shipping companies established that there was a conspiracy to fix prices, that Peake knowingly participated, that the conspiracy had the effect of increasing shipping rates and surcharges, and that this affected interstate commerce. The government also introduced numerous exhibits, including emails sent by Peake himself from his company email, establishing the existence of a conspiracy. For example, in one email from July 11, 2005, Peake told Baci, his co-conspirator and subordinate, that he had learned that Horizon Lines had told Sea Star's clients that Horizon Lines

-27-

was willing to "work with them," and instructed Baci to come up with a "slap." Baci sent Horizon Lines an email the next day, expressing concern about the "level of distrust" building between Sea Star and Horizon Lines.

In another exchange between Peake and Serra from March 22, 2008, Peake complained to Serra that Horizon Lines had been "hurting" him by negotiating with Sea Star clients "Flexi, Goya, Atek and BK." Peake added a warning: "If you're swinging at Crowley[, one of the other freight carriers,] you are missing and hitting me." Serra responded with detailed information about Horizon Lines targeting certain clients and mentioned where he thought Sea Star would set prices. He concluded, "I'll have to go with the best info I have. Not sure communication and availability is working as well as it used to." Peake responded:

> BK I am not all that concerned about (we don't have much of that).
> I am the only one that will lose on ATEC, If I lose it (10 loads a week) I will have to fire back.
> Agree that things aren't working as well as they were. Pete [Baci] has similar complaints.
> Flexi is about fuel and you gave them a BSC discount. Tisk tisk.
> Goya is about you not charging for the overweight permits. Again tisk tisk. Same as cutting the rate in my book.

Serra wrote back, "I'll check them all . . . you are certainly not the target."

Given this fairly direct evidence of the conspiracy's existence, aims, and objectives, we find that the evidence presented at trial did not preponderate against the verdict. To

the contrary, the strength of the government's case weighs in favor of finding that the misconduct was harmless.[12] Thus, while we are concerned by the impropriety of the prosecutors' remarks, we are confident that the district court acted timely and decisively to instruct the jury in great detail to disregard the offending statements. And we are conscious that we should "not set guilty persons free simply to punish prosecutorial misconduct." United States v. Vázquez-Botet, 532 F.3d 37, 59 (1st Cir. 2008). The government's remarks did not so poison the well as to necessitate a new trial, and we affirm the district court's denial of a mistrial on grounds of prosecutorial misconduct.

**B.  Irrelevant and Unfairly Prejudicial Evidence**

Peake argues that the district court also erred in permitting the testimony from witnesses involved in businesses harmed by the conspiracy because the testimony implied that the conspiracy impacted Puerto Rican consumers, therefore again causing the jurors to consider themselves victims of the charged conspiracy. Peake claims the testimony should have been excluded under Federal Rules of Evidence 402 and 403 either as irrelevant or because it caused "unfair prejudice" and had an "undue tendency to

---

[12]  On this final point, we cannot ignore that a per se violation of Section 1 only requires that "an antitrust plaintiff [present] either direct or circumstantial evidence of defendants' 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33, 43 (1st Cir. 2013) (quoting Monsanto Co. v. Spray Rite Serv. Corp., 465 U.S. 752, 764 (1984)).

suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's note to 1972 proposed rules; see also Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

We review a trial court's objected-to evidentiary rulings for abuse of discretion. United States v. Romero-López, 695 F.3d 17, 22 (1st Cir. 2012); United States v. Rodríguez-Berríos, 573 F.3d 55, 60 (1st Cir. 2009). That includes a trial court's determination under Rule 403 that evidence is more probative than prejudicial. See United States v. Ramírez-Rivera, Nos. 13-2285, 13-2289, 13-2291, 13-2320, 2015 WL 5025225, at *26 (1st Cir. Aug. 26, 2015) (citing Walker, 665 F.3d at 229).

Rule 403 "requires the trial court to exclude the evidence if its probative value is substantially outweighed by 'the danger of unfair prejudice.'" United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) (quoting Fed. R. Evid. 403). This analysis "'is a quintessentially fact-sensitive enterprise' which the district court is in the best position to make." United States v. Soto, Nos. 13-2343, 13-2344, 13-2350, 2015 WL 5011456, at *17 (1st Cir. Aug. 25, 2015) (quoting United States v. Joubert, 778 F.3d 247, 255 (1st Cir. 2015), cert. denied, 135 S. Ct. 2874 (2015)). All evidence is by design prejudicial, Varoudakis, 233

F.3d at 122, but unfair prejudice refers "to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." United States v. DiRosa, 761 F.3d 144, 153 (1st Cir. 2014) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)). One such example is when "the evidence 'invites the jury to render a verdict on an improper emotional basis.'" United States v. Landry, 631 F.3d 597, 604 (1st Cir. 2011) (quoting Varoudakis, 233 F.3d at 122).

An abuse of discretion finding on a Rule 403 ruling "is not an easy one to make" and "only in 'extraordinarily compelling circumstances'" would we reverse the judgment of the district court. DiRosa, 761 F.3d at 154 (quoting United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013)); see also Landry, 631 F.3d at 604 ("Rule 403 judgments are typically battlefield determinations, and great deference is owed to the trial court's superior coign of vantage." (quoting United States v. Shinderman, 515 F.3d 5, 17 (1st Cir. 2008))).

Guided by the above framework, we do not find that the district court abused its discretion in permitting the testimony of representatives from businesses affected by the conspiracy. The witnesses never stated that the higher costs incurred by the direct customers of the shipping companies were indirectly transferred to their consumers, and the defense was also allowed to strike questions regarding the effect of the increased costs on the

businesses' bottom line.  The testimony elicited by the government

properly established the effects of fixing prices and rigging bids.

After all, the conspiracy's effect on interstate commerce was an

element of the offense the government was required to establish.

See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of

Okla., 468 U.S. 85, 104 (1984) ("Under the Sherman Act the

criterion to be used in judging the validity of a restraint on

trade is its impact on competition.").    The government's

examination of the witnesses was limited to establishing that

element.  Therefore, we find no abuse of discretion, and affirm the

district court's ruling permitting the witnesses' testimony.

## C.  Theory of Defense Instruction

Peake next argues that he is entitled to a new trial

because he was improperly denied his requested theory-of-defense

jury instruction.   Specifically, Peake requested the following

instruction:

> Mr. Peake does not contest that there was a conspiracy
> that existed between Gabriel Serra, Kevin Gill, Gregory
> Glova, and Peter Baci.   Rather, he contends that he did
> not knowingly and intentionally participate in this
> conspiracy and did not knowingly and intentionally join
> the conspiracy as a member.   Mr. Peake further contends
> that any discussions he had with Gabriel Serra were
> legitimate and competitive discussions and not
> anti-competitive conspiracy related.   Mr. Peake also
> contends that he was competing with Horizon, including on
> market share and price.
>
> Although this is Mr. Peake's defense, the burden always
> remains on the government to prove the elements of the
> offense beyond a reasonable doubt.  If you do not believe
> the government has proven beyond a reasonable doubt that

Mr. Peake intentionally and knowingly joined the conspiracy, you must find him not guilty.

A defendant is "entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it." United States v. McGill, 953 F.2d 10, 12 (1st Cir. 1992) (internal citation omitted). However, "the defendant has no right to put words in the judge's mouth. So long as the charge sufficiently conveys the defendant's theory, it need not parrot the exact language that the defendant prefers." Id. A district court's denial of a theory of defense instruction is reviewed de novo. United States v. Baird, 712 F.3d 623, 627-28 (1st Cir. 2013). But a trial court's refusal to give a particular instruction constitutes reversible error only if the requested instruction (1) was correct as a matter of law, (2) was not substantially incorporated into the charges as rendered, and (3) was integral to an important point in the case. Id. at 628.

Here, regardless of whether Peake should have been granted his instruction, there is no reversible error because the district court offered essentially the same instruction Peake requested, just in its own words. First, the instructions the district court gave stated that "the Government [must prove to the jury] that Mr. Peake is guilty of the crime with which he is charged beyond a reasonable doubt." Second, they mentioned that the government bears the burden of proving that Peake "knowingly and intentionally became a member of the conspiracy" and that the

"conspiracy . . . affected interstate commerce." Third, the instructions referenced the possibility that "competitors may have legitimate, lawful reasons to have contact with each other," and that "similarity of conduct . . . does not necessarily establish the existence of a conspiracy," because "there would be no conspiracy . . . [i]f actions were taken independently by them solely as a matter of individual business judgment." Comparing these passages with Peake's proposed instruction, we cannot conclude that anything Peake asked for was excluded. There is therefore no reversible error.

### D. Jury Deliberations

The last trial-related argument Peake raises is that the district court erred in its response to the two notes from the jury, both received on the second day of deliberations, in which the jury stated it was not able to reach a unanimous verdict. Both times, the district judge sent a note back to the jury, asking the jurors to "continue deliberation." Peake argues that the district court should have declared a mistrial after the second note because it was clear that the jury was at an impasse. Peake also argues that, if the court was going to respond to the note, it was at least required to include in its reply the three elements normally required in an Allen charge.

For some background, when a jury is deadlocked, the trial court may deliver an Allen charge, directing the jury to decide the

case if at all possible. Given the potential coerciveness of such an instruction, our case law holds that such a charge must be balanced by instructions that (1) communicate the possibility of the majority and minority of the jury reexamining their personal verdicts; (2) restate the government's maintenance of the burden of proof; and (3) inform the jury that they may fail to agree unanimously. United States v. Angiulo, 485 F.2d 37, 39 (1st Cir. 1973).

We review the district court's decision not to declare a mistrial or to provide additional guidance to a jury for abuse of discretion, United States v. Vanvliet, 542 F.3d 259, 266 (1st Cir. 2008), and we find there was no abuse of discretion here.

First, we note that the jury sent its notes on Monday afternoon and evening, during its first full day of deliberations, after having deliberated for only hours on Friday. It was thus not an abuse of discretion for the district court to conclude that, particularly after a nine-day trial, the jury needed more time to consider the evidence before a mistrial might be considered.

Second, the district judge's response to the jury, instructing it to "continue deliberations," was not an Allen charge, and therefore did not require the supplemental balancing instructions normally required in an Allen charge.[13] In a similar case, United States v. Figueroa-Encarnación, 343 F.3d 23, 31-32

_____

[13] Indeed, we agree that it would have been premature to give one at this early point in the deliberations, after a nine-day trial.

-35-

(1st Cir. 2003), we held that a district judge's instruction to the jury to go home, relax, and continue deliberations the following day contained no coercive elements and, as such, was not an <u>Allen</u> charge requiring supplemental instructions. Likewise, here, the district court simply asked the jury to rest and come back in the morning to continue deliberations. This was no <u>Allen</u> charge. Accordingly, we find no abuse of discretion in the district court's response to the jury's notes during deliberation.

## VI. Sentencing

As a final matter, Peake argues that, even if his conviction is not overturned, he should be resentenced. Peake raises only one argument regarding his sentence: that the district court incorrectly calculated the volume of commerce affected by the conspiracy, and therefore improperly applied, among other offense-level enhancements, a twelve-level enhancement under section 2R1.1 of the United States Sentencing Guidelines (U.S.S.G.). We deny the appeal of the sentence, finding that the district court correctly applied the sentencing guidelines.

We review a district court's interpretation and application of the sentencing guidelines <u>de novo</u>. <u>United States</u> v. <u>Stoupis</u>, 530 F.3d 82, 84 (1st Cir. 2008). However, "we will not upset the sentencing court's fact-based application of the guidelines unless it is clearly erroneous." <u>United States</u> v. <u>Santos-Batista</u>, 239 F.3d 16, 21 (1st Cir. 2001).

For antitrust offenses affecting a volume of commerce of more than $1 million, the sentencing guidelines provide that the offense level should be adjusted by a certain number of levels according to the volume of commerce that was affected by the conspiracy, as indicated by a table provided therein. See U.S.S.G. § 2R1.1(b)(2). The district court found that more than $500 million in commerce was affected, and that a twelve-level enhancement applied under § 2R1.1(b)(2)(F). Peake argues the volume of commerce was, at most, approximately $386.2 million, and therefore only a ten-level enhancement should have been applied under § 2R1.1(b)(2)(E). He contends that, in calculating the volume of affected commerce, the district court erroneously included commercial activity that took place before 2005, which is when the indictment charged Peake with joining the conspiracy, and that the court also included commerce that was unaffected by the conspiracy.

After a thorough review of the sentencing record, we find that the district court did not err in determining that the affected volume of commerce was more than $500 million. First, the record shows that the district court would have reached its more-than-$500 million number for the volume of affected commerce even without including commerce that might have occurred before 2005, when Peake is charged with joining the conspiracy. So we will move on to Peake's second argument that the district court incorrectly

included in its calculation what he contends was "unaffected" commerce.

In calculating the "volume of commerce," the district court is to consider not just "the damage caused or profit made by the defendant," but the overall amount of sales during the conspiracy. Id. at § 2R1.1(b)(2) & cmt. 7 ("[T]he volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation."); see also United States v. Andreas, 216 F.3d 645, 678 (7th Cir. 2000) ("[I]t is reasonable to conclude that all sales made by defendants during that period are 'affected.'" (quoting United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 90 (2d Cir. 1999)) (emphasis added)). Although there is a presumption that all sales made during the conspiracy were affected, and should therefore be included in the volume of commerce calculation, this is a presumption that the defendant may rebut by offering evidence that some sales were not affected. United States v. Giordano, 261 F.3d 1134, 1146 (11th Cir. 2001).

In this case, the district court had before it data produced by Sea Star indicating that its total revenue between 2005 and 2008 amounted to over $565 million, and it used this number to conclude that the twelve-level enhancement applied. Peake argues that this was an error because the following revenue was "unaffected" commerce and should have been subtracted from the

-38-

total: (1) revenue from non-container freight that he contends was not a part of the antitrust conspiracy, (2) revenue from 2,634 customers that were never discussed in the conspiracy, (3) revenue from fuel surcharges, which Peake argues would have been charged even if there had been no conspiracy, and (4) revenue from Transportation Services Agreements, which Peake claims were routine and entirely lawful, and did not affect interstate commerce. However, in order to exclude this revenue from the volume of affected commerce calculations, Peake was required to show that these transactions were "completely unaffected" by the conspiracy. Andreas, 216 F.3d at 678-79. The district court found that Peake failed to do so.

This is essentially a factual question, and we find no clear error in the district court's findings that the objected-to revenue should have been included in the volume of commerce calculation. Testimony, particularly Baci's, and documentary evidence, including various emails, presented at trial showed that the conspirators had colluded to fix the fuel surcharges, and that revenue from the fuel surcharge was therefore a part of the conspiracy. The fixed surcharges affected all cargo transported, thus affecting all sales, including revenue from non-container freight and from all customers, even if that freight and those customers had never explicitly been made a part of the conspiracy. Finally, evidence at trial showed that Transportation Services Agreements were used in furtherance of the conspiracy. Thus,

-39-

finding no error in the district court's computation of a volume of affected commerce in excess of $500 million, we affirm the sentence.

## VII.  Conclusion

For the foregoing reasons, the conviction and sentence of Defendant-Appellant Frank Peake is

**AFFIRMED.**