# United States Court of Appeals
## For the First Circuit

No. 16-2471

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID E. GORSKI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Thompson, Kayatta, Barron,
Circuit Judges.

Tracy A. Miner, with whom Seth B. Orkand and Demeo LLP were
on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
William D. Weinreb, Acting United States Attorney, was on brief,
for appellee.

January 18, 2018

**BARRON**, **Circuit Judge**.   A jury in the District of Massachusetts convicted David Gorski of conspiring between late 2005 and 2010 to defraud the United States, in violation of 18 U.S.C. § 371, by knowingly procuring government contracts for his construction company on the false premise that the company was owned and controlled by military veterans who became disabled in connection with their military service.   The jury also convicted Gorski of four counts of wire fraud, in violation of 18 U.S.C. § 1343.   The District Court sentenced Gorski to thirty months of imprisonment and entered an order of forfeiture, in the form of a money judgment, in an amount exceeding $6.7 million, which the District Court determined was the amount of the proceeds of Gorski's crimes.

Gorski brings three challenges in this appeal.   First, Gorski seeks to reverse the convictions on the ground that the government's evidence against him was insufficient.   Second, he contends that the District Court should have at least ordered a new trial in light of certain statements that the prosecutor made during closing arguments, which Gorski claims violated his constitutional rights.   Finally, Gorski challenges the forfeiture order and money judgment.   We affirm.

## I.

The charges against Gorski pertain to his role as founder and vice president of a general contracting and construction

services company, Legion Construction, Inc.  Gorski developed the plan for the company in late 2005.  From 2006 to 2010, Legion took advantage of federal programs in which certain federal agencies awarded government contracts on a preferential basis to small businesses owned and controlled by military veterans who were disabled in connection with their military service.  To be eligible for these programs, Legion, through Gorski in his role as the company's vice president, certified in its bids for government contracts that it was a "service-disabled veteran-owned small business," or SDVOSB, within the meaning of the regulations governing the programs.

To qualify as an SDVOSB under those regulations, an SDVOSB had to be of a certain size and had to meet the following two requirements.[1]  See 38 C.F.R. § 74.1 (2010); 38 C.F.R. § 74.1

---

[1] The Small Business Act mandates a goal for the federal government of awarding "not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year" to "small business concerns owned and controlled by service-disabled veterans."  15 U.S.C. § 644(g)(1)(A)(ii).  The Act permits the government's contracting officers, under specified circumstances, to award no-bid contracts to SDVOSBs and to restrict competition for certain contracts to SDVOSBs.  Id. § 657f(a)-(b).  In 2004, then-President George W. Bush ordered all federal agencies to develop a strategy for using the no-bid and restricted-competition provisions to meet the three-percent goal.  Exec. Order No. 13360, 3 C.F.R. 231 (2005).

The Small Business Administration and the Department of Veterans Affairs separately promulgated regulations governing their SDVOSB programs pursuant in part to their respective rulemaking and contracting powers under their organic statutes.  See 15 U.S.C. §§ 634(b)(6), 637; 38 U.S.C. §§ 501, 513.  The Small Business Administration's regulations were in effect as of 2005,

- 3 -

(2008); 13 C.F.R. § 125.8(g) (2005). First, one or more veterans who had become disabled in connection with their military service must have unconditionally owned at least fifty-one percent of the business seeking the contract. See 38 C.F.R. § 74.3 (2010); 38 C.F.R. § 74.3 (2008); 13 C.F.R. § 125.9 (2005). Second, one or more service-disabled veteran owners must have controlled the business. See 38 C.F.R. § 74.4 (2010); 38 C.F.R. § 74.4 (2008); 13 C.F.R. § 125.10 (2005).

With respect to this latter requirement, the regulations during all relevant time periods specified several criteria that service-disabled veteran owners had to satisfy in order to establish that they controlled the business. For example, a service-disabled veteran owner must have held the highest officer position in the business, and, while holding the position, that service-disabled veteran owner, together with any others, must have controlled "both the day-to-day management and long-term decision-making" of the business. 38 C.F.R. § 74.4 (2010); 38 C.F.R. § 74.4 (2008); accord 13 C.F.R. § 125.10 (2005). In 2008, the regulations added an additional criterion to establish control: A service-disabled veteran had to be the highest compensated employee in the business, absent a showing that it

---

and the regulations of the Department of Veterans Affairs were adopted in 2008 and then amended in 2010. The parties agree that those regulations governed the SDVOSB programs of all the federal agencies with which Legion contracted as an SDVOSB.

- 4 -

would benefit the business for a non-veteran to earn more. 38 C.F.R. § 74.4 (2008); see also 38 C.F.R. § 74.4 (2010). And, beginning in 2010, to establish control over the management of the business, service-disabled veteran owners had to work full-time at the business. 38 C.F.R. § 74.4 (2010).

Gorski, who is not himself a service-disabled veteran, certified on behalf of Legion in its bids for government contracts during the relevant time span that the company was compliant with the SDVOSB requirements. Over the years, Legion bid on and won over 200 government contracts based on Gorski's certifications that Legion was an SDVOSB. Those contracts were valued at over $110 million.

In 2010, however, a rival company filed a protest with the Small Business Administration that challenged Legion's SDVOSB status with respect to a contract that the government awarded to Legion that year. Although the agency ruled in Legion's favor, a subsequent criminal investigation by federal law enforcement concluded that, from 2006 to 2010, Gorski had been unlawfully certifying Legion as an SDVOSB in order to fraudulently obtain government contracts for Legion.

In October of 2012, the government charged Gorski in the United States District Court for the District of Massachusetts with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and four counts of wire fraud, in

violation of 18 U.S.C. § 1343.  With respect to the conspiracy charge, the indictment alleged that between late 2005 and 2010 Gorski agreed with "other persons and entities" to defraud the United States "by impairing, impeding, and defeating the lawful governmental function of [various federal agencies] in the implementation, execution, and administration of the SDVOSB program."  The indictment further alleged that the conspirators carried out this agreement by, among other things, procuring government contracts for Legion after Gorski, on behalf of the company, falsely certified in the bids for those contracts between 2006 and 2010 that Legion was an SDVOSB.

With respect to the four counts of wire fraud, the indictment alleged that, as part of this conspiracy to defraud the United States, on four occasions Gorski faxed or emailed documents in interstate commerce that were related to the fraudulent scheme. Finally, the indictment provided notice of the government's intention, upon a successful wire fraud conviction, to seek forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) of any property constituting the proceeds of Gorski's crimes.

Gorski was tried over the course of twelve days in June of 2016.  At the close of the evidence, Gorski moved for acquittal on all counts based on what he contended was the insufficiency of the evidence against him.  The District Court denied the motion,

and the jury convicted Gorski on all counts. Gorski then renewed his motion for acquittal on all counts on the ground that the government had failed to put forth sufficient evidence that he had intended to defraud the United States. He also moved in the alternative for a new trial on the ground that certain statements made by the prosecutor in closing arguments improperly drew the jury's attention to his decision not to testify and thus also improperly shifted the burden of proof to him.[2]

The District Court denied both motions. The District Court then sentenced Gorski to thirty months of imprisonment and fined him $1 million.

In addition, the government moved for an order of forfeiture, in the form of a money judgment, in the amount of the proceeds traceable to Gorski's crimes. The government submitted that those proceeds consisted of all the money that Gorski and his wife received from Legion since its formation, including payments made to them after the end date of the charged conspiracy. The government alleged that those proceeds amounted to more than $6 million. Gorski filed an opposition to the government's motion. Gorski conceded that the proceeds of his crimes were subject to forfeiture, but he contended that those proceeds excluded both the

---

[2] Gorski's motion raised additional grounds for a new trial, but he has abandoned those other grounds on appeal.

money received by his wife from Legion and money that Gorski received from Legion after the end date of the charged conspiracy.

After a forfeiture hearing, the District Court agreed with the government and entered a forfeiture order, in the form of a money judgment, in the amount of $6,756,205.65. The District Court then reduced Gorski's fine to $10,000. Gorski now brings this appeal.

## II.

Gorski first challenges the sufficiency of the evidence against him with respect to his convictions for both conspiracy to defraud the United States and wire fraud. Gorski preserved this challenge below in his motion for acquittal. We review the denial of that motion de novo, drawing all inferences in favor of the government. United States v. George, 841 F.3d 55, 61 (1st Cir. 2016) (citing United States v. Chiaradio, 684 F.3d 265, 281 (1st Cir. 2012)).

## A.

To make out a case of conspiracy to defraud the United States under 18 U.S.C. § 371 against Gorski, the government had to prove that Gorski agreed with at least one other person to defraud the United States, that an overt act was taken by one of the conspirators in furtherance of that agreement, and that Gorski knowingly participated in the conspiracy. See United States v. Ngige, 780 F.3d 497, 503 (1st Cir. 2015) (citing United States v.

Serunjogi, 767 F.3d 132, 139 (1st Cir. 2014)).  A conspirator must have not only an "intent to agree" but also an "intent to effectuate the commission of the substantive offense."  United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994).[3]

The government's theory at trial was that Gorski agreed with others -- and then acted on that agreement -- to obtain government contracts for Legion by certifying that the company was an SDVOSB, even while knowing that Legion did not qualify as an SDVOSB under the applicable regulations.  To prove that theory, the government introduced evidence to show that Legion was not compliant with the SDVOSB regulations in several ways, and that Gorski knew as much.

---

[3] The District Court instructed the jury, as to conspiracy to defraud the United States (and wire fraud), that the government had to prove beyond a reasonable doubt that Gorski acted "with the specific intent" to defraud the United States -- "that is, with a bad purpose either to disobey or to disregard the law."  The District Court further instructed the jury:  "If the defendant acted in good faith, he cannot be guilty of the crime.  If the defendant had a good faith belief that he was obeying the law, even if that belief was mistaken, he did not have the necessary knowledge and intent to commit the crime."  Neither party objected to the instructions below.  On appeal, Gorski purports to fault the District Court for not giving a good-faith instruction.  But, the District Court plainly provided one.  And, in any event, "we have held that [a] separate instruction on good faith is not required . . . where the court adequately instructs on intent to defraud," and Gorski does not challenge the instruction on intent to defraud.  United States v. Berroa, 856 F.3d 141, 161 (1st Cir. 2017) (alterations in original) (quoting United States v. Christopher, 142 F.3d 46, 55 (1st Cir. 1998)).

On appeal, Gorski does not contend that the government put forth insufficient evidence to show that Legion failed to comply with the SDVOSB regulations and that, accordingly, Gorski certified that Legion was an SDVOSB on a false premise. For example, Gorski does not challenge the sufficiency of the government's evidence indicating that, although two service-disabled veterans -- Joseph Steen and Peter Ianuzzi -- alone or together held at least fifty-one percent of Legion's shares at all relevant times, their ownership was not "unconditional," as required under the SDVOSB regulations. 38 C.F.R. § 74.3 (2010); 38 C.F.R. § 74.3 (2008); 13 C.F.R. § 125.9 (2005). Nor does he contend that the government's evidence was insufficient to support its theory that it was Gorski who actually controlled "both the day-to-day management and long-term decision-making" of the business, notwithstanding that either Steen or Ianuzzi formally occupied Legion's highest office as president at all relevant times. 38 C.F.R. § 74.4 (2010); 38 C.F.R. § 74.4 (2008); accord 13 C.F.R. § 125.10 (2005).

Gorski does contend, however, that the government's evidence was insufficient to prove that he intended to defraud the United States. Accordingly, he contends that the evidence was insufficient to show that he had the requisite mens rea to commit the offense of which he was convicted, given that in his view the

evidence showed at most only that he had certified that Legion was an SDVOSB when it was not, conduct which is not itself criminal.

As an initial matter, we observe that the evidence sufficed to permit a jury to find that Gorski was aware that there were requirements under the SDVOSB program pertaining to a service-disabled veteran's ownership and control over the business. For example, an attorney whom Gorski had hired in 2007 to help restructure the company testified that Gorski had told her that he knew what the SDVOSB regulatory requirements were. Thus, the question with respect to Gorski's mens rea turns on whether the jury could have permissibly found that he also knew that Legion did not comply with those regulatory requirements when he certified that it did. And, we think the evidence was more than sufficient to permit a jury reasonably to so conclude.

We begin with the government's evidence regarding the requirement that the ownership of an SDVOSB by one or more service-disabled veterans be "unconditional." The government submitted agreements from 2007 between Legion and, separately, Steen and Ianuzzi -- the two service-disabled veterans who held shares in Legion -- showing that Legion maintained a right to purchase their shares at a specified price before either of them could sell their shares to someone else. Gorski acknowledges as much, and he makes

no argument that such a restriction on their stock ownership was permissible under the regulations.[4]

Gorski nevertheless contends that he could not be found to have had the requisite mens rea to convict him because he contends that the evidence showed that he imposed the restriction only on the basis of the advice of his attorney who drafted "the offending provisions."  But, this argument fails because the evidence showed that he had written a letter to the attorney specifying that the restriction should be included in the terms of the agreements.  Thus, a jury would not have been required to believe that Gorski imposed the restriction solely on the advice of the attorney.

The government also put forth evidence from which a jury could have permissibly inferred that it was implausible that Gorski believed at the relevant times that Legion was compliant with the other SDVOSB requirement -- namely, that one or more service-disabled veterans control the business's day-to-day management and long-term decision-making.  See United States v. Serrano, 870 F.2d 1, 7 (1st Cir. 1989) (reasoning that a defendant's knowledge of a fraudulent scheme can be supported by circumstantial evidence

_____

[4] Gorski does point out, with respect to this evidence, that 13 C.F.R. § 125.9 permitted an SDVOSB to "change its ownership . . . so long as one or more service-disabled veterans own and control it after the change."  But, the fact that the regulations permitted a change in ownership has no bearing on the government's evidence that Steen and Ianuzzi could not sell their shares freely.

showing that lack of such knowledge would be "implausible"). From Legion's founding until 2007, the evidence at trial showed, the only service-disabled veteran owner of Legion was Steen. And, the government offered testimony from multiple witnesses, as described below, supporting the government's theory that Gorski recruited Steen, who died in 2010, to serve as a president for Legion in title only and without any real responsibilities.

For example, a veteran acquaintance of Gorski who was also Steen's friend, Louis Cimaglia, testified that Gorski identified Steen -- whom Gorski had not previously known -- to serve as the president of the company Gorski was creating after calling Cimaglia by phone and asking if he "knew a disabled veteran." According to Cimaglia's testimony, Steen happened to be sitting next to him at the time, so Cimaglia passed Steen the phone, and thus began Gorski's and Steen's partnership.

Next, Steen's financial adviser, William Cole, testified. He recounted that, during a lunch meeting to discuss Gorski's business pitch to Steen, Gorski told the adviser that Gorski needed Steen for the business because of "his veteran's status," and that Steen would not have to invest any money or take on any fiduciary responsibilities.

Finally, Steen's wife testified. She stated that Steen had worked exclusively as an elevator mechanic and inspector since serving in the Korean War and that, at the time Gorski reached out

- 13 -

to Steen to start a construction company, Steen was retired and already "very, very sick."

Gorski does assert in his appellate briefs that he had intended for Steen to be a controlling partner and that, in light of Steen's absence from Legion, he brought Ianuzzi aboard to "stay in compliance" with the regulations. But, he identifies almost no supporting evidence for this assertion, let alone evidence that would have compelled the jury to find in his favor on this score.[5]

In addition to the evidence showing that Gorski had no expectation that Steen would exercise control over Legion, the government also offered substantial evidence that Steen did not in fact exercise such control. Numerous former Legion employees testified that they had never seen Steen at Legion. In fact, Gorski himself concedes in his opening brief on appeal that Steen was "absent" from Legion.

---

[5] Gorski does point to Legion's initial indemnity agreement, in which Steen personally guaranteed Legion's performance on its contracts, and to bank records showing that Steen could withdraw money from Legion's bank accounts. But, Steen's decision to put his personal assets on the line for the company by means of the indemnity agreement does not necessarily indicate that Gorski intended for him to control the company. Nor does Steen's access to Legion's bank accounts necessarily indicate such. Indeed, Gorski's wife also had such access, yet no party has suggested that she controlled Legion. Finally, Gorski cites only Ianuzzi's testimony to support his claim that Gorski made Ianuzzi a partner to ensure Legion's regulatory compliance. But, Ianuzzi did not mention that reason when asked why he and Gorski entered into ownership discussions.

Moreover, the government submitted evidence showing that Gorski was aware that Steen, as an absentee president, played no real role in Legion's management or decision-making. For example, in a 2007 letter from Gorski to Steen that was admitted into evidence, Gorski apprised Steen of several significant developments at Legion that had occurred "over the past couple of months." Those developments included Gorski's addition of Ianuzzi as a new partner, the opening of a new office location, and the fact that Gorski was "in the process of restructuring the company to gain bonding capacity." A jury could reasonably conclude that it would have been implausible for Gorski to have believed that, whatever the precise meaning of the control requirement was, it could be satisfied by being absent from the business and having no real role in such significant decisions.

To be sure, the evidence showed that, in 2007, Ianuzzi acquired an ownership stake in Legion, and it is undisputed that, as an owner of Legion, Ianuzzi worked at the company and was more involved in its day-to-day construction work than Steen was. In fact, Ianuzzi, who was Gorski's chief witness, testified that he was "always in the field getting the buildings built and project[s] complete," while Gorski ran the administrative side of the business. Ianuzzi further testified that management of Legion was a "team effort," and specifically that he hired and fired employees

along with Gorski and that they made decisions together regarding projects on which to bid.

Nevertheless, even during the time period when Ianuzzi was on board, the evidence more than sufficed to permit a jury reasonably to conclude that Gorski knew that Legion was not in compliance with the applicable control requirement. After all, the jury could have found that Ianuzzi's testimony was not credible. See United States v. Kantengwa, 781 F.3d 545, 556 (1st Cir. 2015) ("When examining sufficiency of the evidence, we . . . resolve all credibility disputes in the verdict's favor." (quoting United States v. Conley, 186 F.3d 7, 19 (1st Cir. 1999)) (internal quotation marks and footnote omitted)). For example, on appeal, Gorski points to no testimony that corroborated Ianuzzi's account of his managerial authority.[6] And, four former employees at Legion testified for the government that to their knowledge Gorski alone was responsible for managerial decisions -- at least up until the time of the bid protest challenging Legion's SDVOSB status in 2010.

Finally, the government submitted evidence that sufficed to show that Legion failed to comply with heightened regulatory requirements for establishing a service-disabled veteran's control

---

[6] At trial, Gorski called five former Legion employees (in addition to Ianuzzi) who testified that Ianuzzi served in a supervisory role on certain construction projects. However, the government contends that the testimony was "equivocal" with respect to Ianuzzi's management role, and Gorski does not suggest otherwise.

- 16 -

over an SDVOSB, and that Gorski knew as much. These heightened requirements were adopted in 2008 and 2010.

The government pointed in this regard to an SDVOSB rule adopted in 2008, which required that, in order to establish the requisite control over an SDVOSB, a service-disabled veteran generally had to be the company's highest compensated employee. See VA Veteran-Owned Small Business Verification Guidelines, 73 Fed. Reg. 29024, 29029 (May 19, 2008). With respect to this requirement, Legion's outside accountant, Jeffrey Folan, testified that, upon approaching Gorski about a federal grand jury subpoena that he had received in November of 2010 regarding his work for Legion, Gorski told him: "Well, I think I have a couple of black eyes." According to Folan's testimony, Gorski told Folan that one of the "black eyes" was Gorski's compensation in 2008, which Folan testified Gorski remembered "might be out of alignment with what the rules are for the federal program." In fact, tax filings submitted by the government showed that in 2008 (and 2009) Gorski earned compensation that was several magnitudes more than the compensation of Legion's service-disabled veteran owners. Folan further testified that in the summer of 2010 Gorski approached him with various proposals for how Gorski could get money out of the company other than through his salary in order "to alleviate red flags."

The government also pointed to a regulatory change in February of 2010, which required that any service-disabled veteran owner work full-time at the SDVOSB in order to establish control over it. <u>See</u> VA Veteran-Owned Small Business Verification Guidelines, 75 Fed. Reg. 6098, 6104 (Feb. 8, 2010). The government's evidence sufficed to show that, despite this regulatory change, Steen remained an absentee owner of the company until a rival company filed the bid protest challenging Legion's status as an SDVOSB in March of 2010. Only after the bid protest, the evidence sufficed to show, did Steen transfer his remaining shares to Ianuzzi, who replaced Steen as Legion's president. To prove that Gorski sought to cover up Legion's failure to comply with the new rule in the interim, the government offered evidence that the documents prepared by Legion's outside counsel to execute the buy-out were backdated to a date before the regulatory change. To be sure, there was no direct evidence that Gorski himself caused the documents to be backdated. There was, however, evidence showing that Gorski sought (unsuccessfully) to backdate Legion's revised indemnity agreement reflecting the company's new structure. Thus, a jury could have permissibly inferred from that evidence that Gorski sought to backdate the restructuring documents as well to make it appear that Legion was in compliance with the regulatory requirements, even if Legion's outside attorneys were unaware that this was Gorski's aim.

Despite all this evidence offered by the government with respect to Gorski's mens rea, he nevertheless contends for one additional reason that the jury could not have found beyond a reasonable doubt that he intended to defraud the United States. He points in this regard to evidence showing that he "consulted with attorneys and accountants at two critical periods during the purported conspiracy" -- specifically, when Legion was restructured in 2007 and 2010. Gorski contends that his willingness to seek the assistance of these professionals shows unequivocally that he intended in good faith to comply with the SDVOSB regulations.

However, as the government points out, none of this evidence about what Gorski did in 2007 and thereafter required the jury to find in Gorski's favor regarding whether he had the requisite intent to defraud prior to 2007. Nor did this evidence require the jury to find in his favor on this score with respect to the rest of the charged conspiracy.

The mere act of seeking the help of attorneys and accountants in restructuring the company does not necessarily establish an intent to comply with the SDVOSB regulations. In fact, the attorney whom Gorski hired to draft corporate restructuring documents in 2007 testified that Gorski had not hired her to advise him on Legion's compliance with the SDVOSB regulations, that she was not familiar with those regulations, and

that Gorski had told her that he knew what the regulatory requirements were.[7]  And, although Gorski points to evidence showing that he sought out specialists on federal contract set-aside programs to execute the 2010 restructuring, a jury could have reasonably found, in light of the government's other evidence of Gorski's mens rea, that he was merely seeking to give a post hoc patina of legitimacy to the fraudulent scheme.[8]

To the extent that Gorski is suggesting that he relied in good faith on advice that he received from the attorneys and accountants regarding Legion's compliance with the SDVOSB regulations, and thus that he did not intend to fail to comply with regulatory requirements, the record does not show that Gorski provided the attorneys and accountants with accurate information about Steen's and Ianuzzi's actual ownership of and involvement in

---

[7] As Gorski points out, the attorney also testified that she drafted certain technical provisions in the restructuring documents, which provisions the government invoked to show Legion's non-compliance with the SDVOSB regulations.  However, as we indicated above in connection with the government's evidence that Gorski knowingly violated the requirement that an SDVOSB be owned unconditionally by service-disabled veterans, the record contains a letter from Gorski to this attorney with an "outline of items" that he wanted her to address in the restructuring, including the key provisions at issue.

[8] Gorski does point out that Folan, Legion's outside accountant, testified that Gorski had told him around the time of the 2010 restructuring that Gorski intended to comply with the SDVOSB regulations and that Gorski believed that Legion was in fact compliant.  However, Gorski's self-serving statements hardly required the jury to find in his favor regarding his mens rea, given the strength of the government's countervailing evidence.

the firm.  And, thus, the record does not establish that, on the basis of his reliance on any advice that he received from those professionals, he had a good-faith intent to comply with the regulatory requirements even though the company in fact flouted them.[9]

For these reasons, we conclude that there was more than sufficient evidence for the jury to have found beyond a reasonable doubt that Gorski had the specific intent to defraud the United States, notwithstanding the role outside attorneys and accountants played in the restructuring of Legion in 2007 and 2010.  Gorski's challenge to the sufficiency of the evidence of his conspiracy to defraud the United States therefore fails, and we thus affirm the denial of his motion for acquittal with respect to this conviction.

**B.**

Gorski also challenges the sufficiency of the evidence to convict him on four counts of wire fraud.  To convict Gorski of wire fraud under 18 U.S.C. § 1343, the government had to prove that he knowingly and willfully participated in a scheme to defraud by means of false pretenses, and that he used interstate wire

---

[9] Gorski does point to a response to the 2010 bid protest drafted by Legion's outside attorneys, which stated that "Legion has at all relevant times been a qualified and eligible [SDVOSB] and remains so today."  But, the statement relied on information provided by Steen and Ianuzzi in affidavits, which the jury could have permissibly found that Gorski knew to have misrepresented their roles at Legion.

- 21 -

communications in furtherance of the scheme.  See United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993) (citing Serrano, 870 F.2d at 6).

Gorski does not dispute the sufficiency of the government's evidence showing that he used interstate wire communications on four occasions in connection with the alleged fraudulent scheme.  Nor, again, does he challenge the sufficiency of the evidence showing that Legion procured those contracts on the false premise that it was compliant with the SDVOSB regulations.  Rather, he challenges only the sufficiency of the evidence showing that he intended to defraud the United States because of what he says was his good-faith intent to comply with the SDVOSB regulations.  That challenge therefore fails for the same reasons that his sufficiency challenge with respect to his conspiracy conviction fails.  Thus, we affirm the District Court's denial of Gorski's motion for acquittal as to the wire fraud convictions, too.

## III.

Gorski next contends that, assuming the evidence against him was sufficient, the District Court erred in denying his motion for a new trial, given certain statements that the prosecutor made to the jury during closing arguments.  Gorski claims that the statements improperly drew attention to his decision not to testify

and also thereby improperly shifted the burden of proof to him, such that his convictions must be vacated.

The statements at issue occurred during the rebuttal portion of the closing arguments. The prosecutor sought to rebut Gorski's good-faith defense by arguing to the jury: "Remember, he's the one doing all these things, but he wants you to blame the lawyers, blame the accountants, blame the brokers, blame the contracting officers. That's what he wants because at the end of the day he can't face the music. He can't stand in front of you."

Gorski's counsel objected. The District Court then gave the following curative instruction to the jury: "Let me caution the jury the defendant has a constitutional right not to testify, and no inference of any kind can be drawn from the fact that he did not testify." Gorski's counsel did not ask for a different instruction.

After the jury returned a guilty verdict, Gorski moved for a new trial on the ground that the prosecutor's statement to the jury that Gorski "can't face the music" and "can't stand in front of you" improperly drew the jury's attention to his decision not to testify, thus violating his Fifth Amendment right against self-incrimination, and also improperly shifted the burden of proof to Gorski. At the hearing on that motion, the District Court remarked that the statements were "unfortunate and should not have been made" but did not order a new trial because the District Court

found that the statements were harmless.  The District Court reasoned that it had immediately issued a curative instruction and that it had "modified [its] standard instruction" on the defendant's constitutional right not to testify during its charge to the jury in order "to make it a little bit stronger."

We review the District Court's denial of a motion for a new trial for abuse of discretion.  United States v. Rodriguez, 675 F.3d 48, 58 (1st Cir. 2012) (citing United States v. Boylan, 898 F.2d 230, 262 (1st Cir. 1990)).  A defendant is not entitled to a new trial on the basis of a prosecutor's improper statements to the jury unless they resulted in prejudice to the defendant. Id. at 62 (citing United States v. Giorgi, 840 F.2d 1022, 1037 (1st Cir. 1988)).  With respect to whether a prosecutor's improper statements during closing arguments resulted in such prejudice, "[w]e afford the district court substantial deference . . . , reflecting the trial judge's familiarity with the case." United States v. Carpenter, 494 F.3d 13, 24 (1st Cir. 2007).

Where a defendant contends that statements by a prosecutor violated the defendant's Fifth Amendment right against self-incrimination and thereby also impermissibly shifted the burden of proof to the defendant, we have said that the test for prejudice is "whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." Rodriguez, 675 F.3d at 62 (quoting United States v.

Azubike, 504 F.3d 30, 39 (1st Cir. 2007)) (internal quotation marks omitted). The prejudice analysis turns on a three-part inquiry into: (1) "whether the prosecutor's conduct was isolated and/or deliberate"; (2) "whether the trial court gave a strong and explicit cautionary instruction"; and (3) "whether it is likely that any prejudice surviving the instruction could have affected the outcome of the case."[10] Id. (quoting United States v. Gentles 619 F.3d 75, 81-82 (1st Cir. 2010)) (internal quotation mark omitted).

Gorski does not suggest that the prosecutor's statements were anything more than an isolated incident of prosecutorial error in the course of the trial. But, he does contend that the error constituted a deliberate attempt to violate his Fifth Amendment right against self-incrimination because, in his view, the prosecutor's statements to the jury that Gorski "can't face the music" and "can't stand in front of you" obviously referred to Gorski's decision not to testify.

The government disputes this point. The government suggests that the prosecutor made the statements "in reference to

_____

[10] Gorski's opening brief refers to four, rather than three, factors that we indicated were relevant to the prejudice analysis in United States v. Balsam, 203 F.3d 72, 87 n.19 (1st Cir. 2000). The government points out in its brief that those four factors are subsumed by our three-factor inquiry, and Gorski's reply brief does not press an alternative theory but rather refers exclusively to the three-factor inquiry.

Gorski's decision to sit with his family in the gallery rather than at counsel table" during the trial, which the District Court had permitted him to do.

We need not decide who is right. The first factor is not necessarily dispositive. See United States v. Zarauskas, 814 F.3d 509, 516 (1st Cir. 2016). And, here, the District Court gave a curative instruction immediately following the problematic statements. The instruction did not specifically strike those statements or instruct the jury to disregard them, as the instruction in Rodriguez did. See Rodriguez, 675 F.3d at 63. But, Gorski did not ask for a stronger instruction, and we have found an instruction to be sufficiently curative in similar circumstances where the instruction cautioned the jury of the defendant's right not to testify without either striking them or issuing a "disregard" directive. See Zarauskas, 814 F.3d at 516.

On appeal, Gorski does claim that the curative instruction was insufficient because it was "calm and delivered in a normal tone of voice," whereas the prosecutor's statements were "delivered forcefully and dramatically, while shouting." Gorski cites no authority, however, that indicates this difference should matter, and we do not see why it should, given that "[i]t is a well established tenet of our judicial system that juries are presumed to follow [curative] instructions." Rodriguez, 675 F.3d

at 63 (first alteration in original) (quoting <u>Gentles</u>, 619 F.3d at 82).

Gorski also contends that the curative instruction did not address the risk that the prosecutor's statements shifted the burden of proof to Gorski. But, to the extent that drawing attention to Gorski's decision not to "face the music" or "stand before" the jury can be construed as placing the burden of proof on Gorski, Gorski's challenge on that ground is -- as the government suggests -- derivative of his Fifth Amendment argument that the statements improperly suggested that Gorski should have testified. Thus, an instruction that cured any prejudice resulting from drawing attention to Gorski's decision not to testify would also necessarily cure any prejudice from burden-shifting attributable to the prosecutor's remarks.

As to whether that instruction sufficed to ensure that the "unfortunate" statements did not so poison the well as to warrant a new trial, we conclude that, for the reasons elaborated in Part II of our opinion, the government's case against Gorski was too strong for it to have been an abuse of discretion for the District Court to have determined that the prosecutor's statements were harmless in light of the curative instruction. As we explained, the government put forth a wealth of evidence in support of its theory that Gorski certified Legion as an SDVOSB even though he was well aware that it was not compliant with the SDVOSB

regulations. And, while Gorski contends that his consultation with outside attorneys and accountants in 2007 and 2010 established his good-faith intent to comply with those regulations, the evidence he puts forward on that score is far too minimal to establish prejudice.

We did say in United States v. Hardy, 37 F.3d 753 (1st Cir. 1994), on which Gorski relies, that an improper statement by a prosecutor may still be significant enough to poison the well in a "close" case, notwithstanding the provision of a curative instruction. Id. at 759. But, in Hardy, in which the defendant was convicted for unlawfully possessing firearms and ammunition, id. at 756, we explained that the case was close because "the government's case against [the defendant] largely rested on the credibility of [the arresting officer]" and, even then, "the jury was required to draw a number of inferences in order to convict [the defendant]." Id. at 759. In particular, the arresting officer was the only witness who testified with respect to the defendant's possession of the firearms and ammunition, yet, according to his testimony, he never saw the defendant with a firearm or ammunition and merely heard a "soft thud" on the ground near where the defendant had been standing and where a later search discovered two firearms with ammunition. Id.

Here, by contrast, the verdict did not turn on the credibility of one witness, who provided only circumstantial

evidence.  Far from it, as we have explained at some length.  Thus, in light of the strength of the evidence supporting the verdict, we conclude that -- even assuming the prosecutor's statements were improper and deliberate -- the District Court acted within its discretion in ruling that its instruction likely cured any prejudice, and that any surviving prejudice could not in this case have so poisoned the well as to affect the jury's verdict.[11]  We therefore conclude that the District Court did not abuse its discretion in denying Gorski's motion for a new trial.

## IV.

Finally, we turn to Gorski's remaining challenge, which is to the forfeiture order and money judgment.  The District Court entered an order of forfeiture, in the form of a money judgment, in an amount totaling more than $6.7 million, which it determined were the "proceeds" traceable to Gorski's crimes, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  Gorski challenges the validity of the money judgment, as well as the amount of the forfeiture.  We review preserved legal challenges to forfeiture

---

[11] As noted above, during its charge to the jury, the District Court also supplemented its immediate curative instruction with a stronger instruction on the defendant's constitutional right not to testify than it normally would have given during a jury charge. As Gorski points out, in Hardy we discounted the curative effect of a later instruction given during the charge to the jury that followed an immediate curative instruction because that later instruction did not specifically address the prosecutor's improper remark.  Hardy, 37 F.3d at 757 n.3.  But, a strengthened instruction during the jury charge certainly did no harm here.

orders de novo, but we review unpreserved challenges for plain error. United States v. Ponzo, 853 F.3d 558, 589 (1st Cir. 2017).

## A.

We begin by dispensing with Gorski's challenge to the money judgment. In his reply brief, Gorski challenges the federal courts' practice of issuing money judgments in forfeiture orders, by which the government may seize future assets to satisfy the forfeiture order. Gorski contends that the practice is no longer valid under Honeycutt v. United States, 137 S. Ct. 1626 (2017), which the Supreme Court issued after initial briefing in this case.

Honeycutt held that a defendant may not be held jointly and severally liable under a certain forfeiture statute, 21 U.S.C. § 853, for property that a co-conspirator, but not the defendant, acquired from the crime. Id. at 1630. The Court reasoned that the forfeiture statute did not authorize joint and several liability. Id. at 1632-34.

Gorski seizes on that reasoning to contend that money judgments in forfeiture orders now must be considered invalid because the forfeiture statutes do not expressly authorize money judgments. However, by Gorski's own account, our existing precedent is to the contrary. See United States v. Hall, 434 F.3d 42, 59-60 (1st Cir. 2006). And, Honeycutt does not permit us to reach a different result as a three-judge panel, given that -- as Gorski himself acknowledges -- Honeycutt "did not rule on the

issue" that he has presented to us. See United States v. Monteiro, 871 F.3d 99, 108 (1st Cir. 2017) (citing United States v. Mouscardy, 722 F.3d 68, 77 (1st Cir. 2013)).

## B.

With that issue out of the way, we turn to Gorski's challenge to the forfeiture amount. The District Court found that more than $6.7 million was subject to forfeiture as the proceeds of Gorski's crimes. That amount represented all the money that Gorski and his wife received from Legion, including dividends, salary, bonuses, and corporate payment for personal goods such as a swimming pool at Gorski's home. However, Gorski contends that the District Court erred by not crediting against this amount either (1) tax payments that Gorski made to the government on his income from Legion or (2) the fair market value of his work on construction projects that benefitted the government.

Gorski assigns this error based on alternative grounds. First, he claims that the District Court misapplied the statutory definition of the forfeitable "proceeds" under § 981. Second, he contends that, assuming the forfeiture statute does not require the credit, the forfeiture amount ordered by the District Court violates the Eighth Amendment, because it is grossly disproportionate to the gravity of Gorski's crimes and would deprive him of his livelihood. He also contends that, in those circumstances, the statute fails rational basis review under the

Equal Protection and Due Process Clauses.  The government disagrees

with Gorski as to whether he preserved these challenges below and

also defends the amount of forfeiture on the merits.

**1.**

We begin with Gorski's statutory challenge.  Section

981(a)(1)(C) provides that "[a]ny property, real or personal,

which constitutes or is derived from proceeds traceable to a

violation of" certain specified statutes -- which the parties agree

include the wire fraud statute -- is subject to forfeiture to the

United States.[12]  Although § 981 pertains to civil forfeiture,

§ 2461(c) provides that the government may seek criminal

forfeiture whenever civil forfeiture is authorized in connection

with a criminal offense.

Section 981, as a whole, includes multiple definitions

of "proceeds."  See Stefan D. Cassella, Asset Forfeiture Law in

the United States § 25-4, at 910–18 (2d ed. 2013 & Supp. 2016).

But, the parties agree that § 981(a)(2)(B)'s so-called "net

profits" provision provides the relevant definition of "proceeds"

in this case.  That definition provides in full:

---

[12] The specified crimes include "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)."  18 U.S.C. § 981(a)(1)(C).  In turn, § 1956(c)(7) of Title 18 encompasses "any act or activity constituting an offense listed in section 1961(1) of this title," which includes a violation of § 1343, the wire fraud statute under which Gorski was convicted.

> In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services.  The claimant shall have the burden of proof with respect to the issue of direct costs.  The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(B).

Gorski contends that the District Court erred in applying this definition of "proceeds" by failing to credit either the payments that Gorski made to the government for his personal income taxes on the income that he drew from Legion or the fair market value of his work on the government construction projects. Gorski reasons that the statute's exclusion from the forfeiture amount of "direct costs incurred in providing the goods or services" applies to all defendants, whether individuals or entities.  And, he says, the provision then expressly specifies that only an "entity" defendant's income taxes cannot constitute "direct costs," which, in his view, implies that his personal income tax payments on his income from Legion do constitute excludable "direct costs."  Belatedly at oral argument, Gorski further argued that the fair market value of his work was also an excludable "direct cost" on the theory that he had to pay for the cost of labor -- whether performed by him or someone else -- in

- 33 -

order to carry out the government construction projects that were part of his fraudulent scheme.

We, however, agree with the government that Gorski did not present this novel statutory argument concerning "direct costs" to the District Court. Gorski did ask in the forfeiture hearing -- albeit not in his papers opposing the government's forfeiture motion -- for a credit of at least several hundred thousand dollars that reflected both his income tax payments to the government and his compensation from Legion for services rendered on government projects. However, Gorski never argued in the forfeiture hearing that his tax payments and compensation could be credited as "direct costs" under § 981(a)(2)(B)'s definition of "proceeds." Nor did he object when the District Court stated that Gorski "incurred no direct costs" within the meaning of the statute.

With respect to his income tax payments, Gorski contended below only that "there should be some consideration" of the fact that he paid his taxes because "the government got the benefit of that." And, with respect to crediting his compensation, he argued below for doing so only "because there's no dispute that Mr. Gorski worked and that these buildings got built." Moreover, there is no indication in the record that the District Court understood those arguments to be tied to the statutory theory of "direct costs" that Gorski raises on appeal. In fact, the District

Court rejected Gorski's request to credit his tax payments and compensation precisely because Gorski had not explained how such credits would be tethered to § 981(a)(2)(B)'s definition of "proceeds" (or any other source of law).[13]

Because Gorski failed to preserve this issue, our review is for plain error. See United States v. Delgado-Sánchez, 849 F.3d 1, 6 (1st Cir. 2017) (citing United States v. Sánchez-Berríos, 424 F.3d 65, 74 (1st Cir. 2005)). And, we find no such error. Gorski offers no clear supporting authority for his novel statutory argument. Nor is it at all clear that it has any basis. Even if income taxes paid by Legion in providing construction services to the government might be considered a "direct cost[] incurred in providing the . . . services," it is not plain how the personal income taxes paid by Gorski on the income that he drew from Legion could be a "direct cost" incurred in providing those services. 18 U.S.C. § 981(a)(2)(B). Similarly, even if we assume that compensation paid by a business to an employee might be a "direct cost" incurred by the business in providing its services, it is

---

[13] Gorski did object at the end of the forfeiture hearing "that the statute only applies to entities, and Mr. Gorski is not an entity." However, in context, that objection seems to be a reference to the District Court's suggestion that the entirety of § 981(a)(2)(B) might apply only to entities, not individuals. Regardless of the nature of the objection, Gorski did not develop below the argument he presses on appeal -- namely, that the provision applies to both individuals and entities, but that "direct costs" has a different meaning for individuals.

not plain how that compensation when received by the employee could also be said to be a direct cost incurred by the employee. Nor does Gorski make any argument as to how his theory could succeed under the plain error standard.

**2.**

Gorski's constitutional arguments fare no better. During the forfeiture hearing, the District Court noted its own view that not crediting taxes that Gorski had paid to the government on income from Legion that was subject to forfeiture is "not proportionate or fair. There are possible constitutional issues under the Eighth Amendment perhaps or perhaps due process [or] equal protection." The District Court also stated that it had "some reservations as to forfeiting Mr. Gorski's salary because he did perform work. He provided value to the government, and something about that seemed unfair as well, to forfeit everything he was paid." However, despite its openness to the idea, the District Court concluded that Gorski had not developed any constitutional (or equitable) argument that would allow it to credit Gorski's tax payments or his compensation.[14]

---

[14] The District Court also concluded that, insofar as "equity" would permit a credit for such fair market compensation, Gorski had failed to identify any amount that would be a reasonable estimate of the market value of his services that the record would support. The District Court did note that there was evidence regarding the annual compensation of an executive project manager at Legion (around $50,000 to $85,000). And, the District Court also stated that fair market compensation for Gorski would probably

Gorski points out that he did object at the close of the forfeiture hearing that the forfeiture amount "has an Eighth Amendment violation potential." But, he never developed any Eighth Amendment argument during the forfeiture hearing. On that score, he did not argue below, as he does on appeal, that the forfeiture amount will deprive Gorski of his livelihood. Nor did he make any equal protection or due process argument.

As with Gorski's statutory argument, Gorski also failed to develop below the constitutional argument that he presses on appeal -- namely, that a credit for his tax payments and compensation is constitutionally required. Thus, our review is for only plain error, a standard Gorski cannot meet. We are aware of no clear supporting authority for this constitutional argument. Nor does Gorski argue otherwise. Accordingly, we affirm the District Court's forfeiture order and money judgment.

**V.**

For the foregoing reasons, the judgment of the District Court is **affirmed**.

---

be around $100,000 to $120,000 per year. But, the District Court concluded that, in the end, it did not have any evidence of that compensation amount other than what the one project manager earned. Accordingly, the District Court ruled that, even if there was a legal basis for equitably crediting Gorski's compensation, Gorski had not established a necessary predicate for that equitable credit.